MARCONI WIRELESS TELEGRAPH CO. OF AMERICA v. NATIONAL ELECTRIC SIGNALING CO. (two cases).

(District Court, E. D. New York. March 17, 1914. On Reargument, April 6, 1914.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—WIRELESS TELEGRAPH APPARATUS.

The Marconi reissue patent, No. 11,913 (original No. 586,193), for improvements in transmitting electrical impulses and signals and in apparatus therefor, claim 3, was not anticipated and is valid. While the patentee did not discover the principles upon which the transmission of electromagnetic waves is based, nor invent the primary appliances therefor, he was, as claimed in his specification, the first to discover and use any practical means for effective telegraphic transmission, and intelligible reception of signals produced by artificially formed Hertz oscillations. Such claim, however, has for one of its elements an imperfect electrical contact at the receiving station, consisting, as shown in the specification, of a glass filings tube or coherer, the function of which is to close a local battery circuit, so that it may operate a relay, and an earth connection to one end of the contact, and is not infringed by an apparatus which has no coherer, nor anything acting as a local circuit closer, but employs an electrolytic or crystal detector, having no earth connection, and in which the indicator is moved directly by the received oscillating current.

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—WIRELESS TELEGRAPH APPARATUS.

The Lodge patent, No. 609,154, for improvements in electrical telegraphy, the basic purpose of which is to utilize in a system of wireless telegraphy the principle of sympathetic resonance through the cumulative effect of a series of waves, as distinguished from a single wave of great amplitude, discloses patentable novelty and is valid; also held infringed.

3. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — WIRELESS TELEGRAPH APPARATUS.

The Marconi patent, No. 763,772, for apparatus for wireless telegraphy, the stated object of which is to increase the efficiency of the system and to provide new and simple means whereby oscillations or electric waves

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

from a transmitting station may be localized, when desired, at any se-
lected receiving station or stations, which object is accomplished by
the use of oscillation transformers at both the transmitting and receiv-
ing stations, consisting of an open and closed circuit in each, linked
through a transformer, the four circuits being tuned together, was not
anticipated in the art, and discloses patentable invention; the apparatus
shown being a distinct advance over that of the patentee's prior patent,
and the Lodge patent, No. 609,154; also *held* infringed.

4. PATENTS (§ 289*)—SUIT FOR INFRINGEMENT—LACHES.

A suit for infringement *held* not barred by laches, because of mere
lapse of time after the issuance of the patent before its commencement;
it appearing that during most of that time defendant was not making
commercial use of the alleged infringing device, and that there was no
ground for equitable estoppel.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469; Dec.
Dig. § 289.*]

### On Reargument.

5. PATENTS (§ 318*)—SUIT FOR INFRINGEMENT—RECOVERY OF DAMAGES AND
PROFITS—LACHES.

Where the owner of a patent has for years permitted its infringement
without taking action, in a subsequent suit against another infringer he
is not entitled to recover profits and damages.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec.
Dig. § 318.*]

In Equity. Two suits by the Marconi Wireless Telegraph Company
of America against the National Electric Signaling Company. The
first suit involves reissued letters patent No. 11,913 (original No. 586,-
193, dated July 13, 1897), for improvements in transmitting electrical
impulses and signals and in apparatus therefor, issued to Guglielmo
Marconi on June 4, 1901, and letters patent No. 609,154, for improve-
ments in electrical telegraphy, issued to Oliver Joseph Lodge on Au-
gust 16, 1898, now owned by complainant. The second suit involves
letters patent No. 763,772, for improvements in apparatus for wireless
telegraphy, issued to Guglielmo Marconi on June 28, 1904. Decree for
complainant.

Sheffield, Bentley & Betts, of New York City (Livingston Gifford,
L. F. H. Betts, and John W. Peters, all of New York City, of coun-
sel), for complainant.

F. W. H. Clay, of Pittsburgh, Pa., and H. G. Ogden, of New York
City (F. W. H. Clay and Frederick W. Winter, both of Pittsburgh,
Pa., and Melville Church, of Washington, D. C., of counsel), for de-
fendant.

VEEDER, District Judge. The patents in issue relate to the com-
munication of intelligible signals by means of the radiation and de-
tection of waves in the ether of space. In the popular imagination
radio-telegraphy is coextensive with wireless telegraphy, but it is in
fact only the culmination of successive efforts, beginning apparently
in ancient Egypt, to transmit intelligence without the aid of any for-
mal connecting medium. The earlier visual and auditory methods—
the beacon fire, the semaphore, the heliograph, the cannonade—were
subject to such obvious limitations that they have given way to electri-

cal transmission. The need for wireless telegraphy became apparent as soon as the advantages of wire telegraphy were apprehended, because it was apparent that there were places where it was not practicable to stretch wires. The system of wireless telegraphy by radiation, with which these actions are directly concerned, is, in fact, only one, although the latest and most successful, of various methods by means of which the electrical problem has been approached. It is to be distinguished, therefore, at the outset, from other methods of electrical wireless communication, which operate upon entirely different principles.

First in order of time was the conduction system, the essential feature of which is that some other form of material conductor is substituted for wires. These substitutes have been in all cases either the earth or bodies of water, since they are the only natural conductors that are sufficiently common and extensive for use. In practice it was preferably employed on the banks of bodies of water. Wires stretched along opposite banks, constituting primary and secondary circuits, were grounded at both ends. Currents of electricity generated by a battery in the primary circuit on one bank leak over to the wire in the secondary circuit on the other bank. By means of circuit making and breaking signals were thus transmitted from one bank to the other. It appears that Prof. Morse discovered this method of communication as early as 1842. While giving in this city a public demonstration of the practicability of his wire telegraphy, a passing vessel parted the wires which he had stretched from Governors Island to Castle Garden. In his discomfiture he immediately devised a plan for avoiding such accidents in the future by so arranging wires along the banks of the river as to cause the water itself to conduct the electricity across. Sir William Preece, the engineer of the British postal service, subsequently worked out more extensive methods of operation upon this principle. But the distance covered did not exceed two or three miles, and the large amount of wire required was a curious feature of this system of so-called "wireless" telegraphy.

The inductive system furnished a wider field of experiment. Of this there are two types: Electromagnetic induction, and electrostatic induction. Electromagnetic induction operates through the production of a magnetic field in one complete circuit, which induces a current in another complete circuit in virtue of the stretching of magnetic lines from the transmitting to the receiving circuit. This method was successfully employed for short distances in England by Sir William Preece. The Smith patent, No. 247,127, and the Phelps patent, No. 312,506, show this inductive type as applied to railroad telegraphy. Impulses produced in a wire extending along the track were communicated to a moving train carrying a circuit, which was connected through the wheels to the rails at opposite ends of the car.

Electrostatic induction differs from electromagnetic in that it does not make use of a magnetic field, but depends upon high voltage or pressure for the purpose of charging the earth, so to speak. An early and conspicuous illustration of this type is shown in patent No. 350,299, granted to Prof. Dolbear, of Tufts College, in 1886. It operates

by variation of potential in two circuits. The transmitting circuit consists of a battery connected through a carbon transmitter to the primary winding of an induction coil, the secondary terminals of which are connected respectively with an elevated wire and the ground. In the receiving circuit there is a similar elevated wire connected to one terminal of a telephone receiver, the other terminal of which is connected directly with the earth. To increase the distance through which signals could be transmitted, Dolbear subsequently attached the wires to kites.

Of the same type is patent No. 465,971, granted to Thomas A. Edison in 1891, for a signaling system having elevated induction plates, supported on masts and connected with the earth. Edison states that he had discovered that:

"If sufficient elevation be obtained to overcome the curvature of the earth's surface and to reduce to the minimum the earth's absorption, electric telegraphing or signaling between distant points can be carried on by induction without the use of wires connecting such distant points."

He deemed this discovery especially applicable to telegraphing across bodies of water, between ships at sea, and between ships and shore. The method of operation was described as the variation of electrical tension in the two circuits.

These systems of wireless telegraphy by conduction and induction are of historical rather than practical value. Their utility was very limited, and the cost of installation was often greatly in excess of the cost of wire telegraphy. Distance being the vital consideration in any system of communication, they have given way to a system which operates upon an entirely different principle, that of electromagnetic radiation.

The patents in suit relate, then, to wireless telegraphy through the propagation, control, and detection of ether waves, commonly called "Hertzian waves," after the German scientist who first demonstrated their existence. Briefly, they disclose ways of organizing and operating electrical apparatus so as to constitute sending and receiving telegraph stations, whereby electromagnetic waves, effected by the production of an electric spark between charged conductors, and capable of traveling long distances before becoming dissipated, may be limited or radiated in definitely related trains, corresponding to an intelligible code of signals, and thereby detected at a distant station. The invisible electric waves, running at tremendous speed over the surface of the globe, produce definitely detectable electric currents in conductors that obstruct their path. By timing the impulses electrically emitted from the sending station to produce the dots and dashes, or short and long intervals, of the Morse alphabet, the succession of the correspondingly received electric currents set up in the receiving station by the impact of the outspreading waves become interpretable as dots and dashes, so as to convey messages to the receiving operator.

All signaling at a distance, whether with or without wires, requires three fundamental factors: A device to produce the signal, a medium to carry it, and a device to receive or detect it. The transmitter, in its simplest form, may be briefly described. Radiation is produced by

the sudden discharge of a Leyden jar or other condenser. This discharge is secured by arranging a circuit commencing in one plate and, ending in the other plate of the condenser, and containing a spark gap of such a length that when, in process of charging, the pressure in the condenser has reached a certain point, the air between the balls of the gap is broken down and a spark passes across the gap. Until the spark passes the circuit is incomplete and no discharge takes place, but the spark renders the air between the balls of the gap a conductor, and by suddenly completing the circuit causes the condenser to discharge instantaneously through the gap. The charge in the condenser rushes from the positive plate through the spark gap to the negative plate, overcharging that plate and then rushing back again; the process being repeated until by loss of energy an equilibrium is finally established. The operation is analogous to the plucking of a spring in a vice. Pull aside one end, and its elasticity tends to make it recoil; let it go, and its inertia causes it to overshoot its normal position; both its elasticity and inertia cause it to swing to and fro until its energy is exhausted. The elastic displacement of the spring corresponds to electrostatic charge, or, roughly speaking, to electricity; its inertia corresponds to magnetism. The nature of the oscillatory discharge was investigated by Henry as early as 1839, and the conditions of capacity and inductance necessary to produce such a discharge were subsequently established by Kelvin and Helmholtz.

The connecting medium by means of which this energy is carried on in the form of waves is the all-pervading ether of space. The theory that action is possible at a distance across empty space is now exploded. Matter cannot act where it is not, but only where it is. Waves we cannot have, unless they be waves in something. The waves do not exist in ponderable matter—solid, liquid, or gaseous—but in that imponderable, not directly detectable, and therefore hypothetical, universal medium called the ether, which is assumed to fill all space, whether occupied by ponderable matter or not. The terms in which these ether waves are described are largely based on analogy, and are really a cover for ignorance rather than an exposition of fact.

A wave is a disturbance periodic in both time and space. The essential properties of a medium capable of transmitting wave motion are elasticity and inertia—elasticity in some form, in order to store up energy and effect recoil; inertia, in order to enable the disturbed substance to overshoot the mark and oscillate to and fro. Various forms of wave motion in matter are familiar. When the wind disturbs the surface of a body of water, since water has mass, and hence inertia and momentum, and a restoring force in gravity, waves result. Similarly, the motion of a line in still water sets up ripples which travel outward in widening circles. Sound is the sensation produced in our ears by waves of condensation and rarefaction set up by the expenditure of sudden energy upon the air. Where the medium in which the expenditure of energy sets up waves is matter, there is no insuperable difficulty in comprehending them. The hypothesis of the universal ether was originated largely to afford some sort of basis for a theory which would account for the transmission of light and radiant heat energy. Our eyes are in fact detectors of ether waves, since we ex-

perience the sensation of light by the abstraction of energy from such ether waves. Since we cannot conceive of the transfer of energy otherwise than directly or by wave motion, this hypothesis of the universal ether was devised to afford a vehicle for thought and expression regarding phenomena the precise nature of which was unknown.

The theory of the luminiferous ether had long been well known. It was demonstrable that light, consisting of waves of some sort, travels at the rate of 186,000 miles per second, thus taking eight minutes on the journey from the sun to the earth. Hence there must necessarily be in space some medium in which the waves exist and which conveys them. This medium was called the "luminiferous ether." The kinship' between the luminiferous ether and the medium by means of which an oscillatory discharge of energy is transmitted, first suggested by Faraday· in 1845, was theoretically demonstrated by the English physicist, James Clerk Maxwell, in 1864. While investigating the phenomena of light and the medium by which it travels, he examined the theoretic effect which the oscillatory discharge of electricity would have on the ether, and arrived at the conclusion that each complete oscillation would create an etheric disturbance or wave, which would travel in all directions through space with the velocity of 186,000 miles a second. He pointed out that this velocity is so nearly that of light that there was strong reason to conclude that light itself and other forms of radiant energy are in reality electromagnetic disturbances propagated in the form·of waves. That is to say, the entire material universe lies in one all-pervading electromagnetic field, called for convenience the ether, and if this field be disturbed at any point the disturbance is propagated throughout the field in the form of waves. Just as a tuning fork vibration in the air excites aerial waves or sound, so an electromagnetic discharge excites ether waves. It is like light in that it travels at the same pace, and is reflected and refracted according to the same laws. Yet it cannot be seen. Physically such waves have attributes of light waves, but physiologically they are not light waves, because they do not affect the retina. The vibrations of the Leyden jar were too slow to enable the eye to respond. Yet they were too rapid for the ear. A great gap remained between the highest audible and the lowest visible vibrations.

Although Clerk Maxwell demonstrated scientifically that from the known properties of electricity and magnetism such waves should exist, he did not demonstrate physically their existence. It was a quarter of a century later that the presence of electric waves was detected. It remained for Heinrich Hertz, professor of physics in the University of Bonn, to give experimental verification to Clerk Maxwell's theory. It was in 1888 that Hertz carried on the epoch-making series of experiments which have made radio-telegraphy possible. He published his researches in Germany, but his papers were collected, translated, and published in England by D. E. Jones in 1893. Hertz's apparatus was of the simplest construction. To generate electric waves he employed an oscillator or radiator composed of two horizontal metallic conductors in the shape of plates attached to small rods terminating in polished metal balls. These rods were connected to the secondary terminals of an induction coil, and the two balls brought into close proximity to

form a small spark gap. The interruption of the current in the primary of the coil causes a discharge across the spark gap, producing the spark in the ether which results in the radiation of a wave. During the passage of this spark the air gap between the balls becomes highly conductive, but the potential difference between the charged plates immediately begins to equalize itself by a series of rapidly damped surges.

The most important contribution of Hertz was the discovery of a simple means for detecting the presence of such radiation. This device consisted simply of a single turn of wire, forming a ring, provided with a minute spark gap between two metallic knobs. When this ring or loop was held near an active oscillator, electric impulses were set up which revealed themselves by minute sparks at the gap between the balls. This, the first wireless detector, is known as a "resonator." By a series of experiments Hertz proved that such waves possessed characteristics of light, and he determined their length by direct tests. But inasmuch as he never succeeded in producing waves which were detectable at more than a score of meters or so, it is not surprising that he did not realize that he had disclosed the elements of a system of wireless telegraphy.

Hertz's disclosures excited widespread interest in the scientific world, and his experiments were repeated and extended by others. In 1889 Sir Oliver (then Professor) Lodge published an article on "Electrical Radiation and its Concentration by Lenses," in which he describes a number of experiments carried on by him with Hertz oscillators. One was with a gigantic Hertz oscillator, consisting of a pair of copper plates hung from a high gallery. By exciting this oscillator he found that extraordinary surgings were experienced in all parts of the building, and that sparks could be drawn from the water pipes by simply holding a pen knife close to them.

"Out of doors some wire fencing gave off sparks, and an iron roof shed experienced disturbances which were easily detected when a telephone terminal was joined to it; the other terminal being lightly earthed. (Sometimes I utilized wire fencing as one of the plates of the oscillator, and thus got still bigger and further spreading waves.)"

Prof. Righi, of Bologna, overcame the oxidization of the spark balls by partly inclosing two metal spheres in oil, and ranging in line with them two smaller spheres which form the secondary terminals of the induction coil.

Sir Oliver Lodge and Edouard Branly improved upon Hertz's simple resonator by devising the coherer detector. The coherer, as it was named by Lodge, is based upon the discovery that the enormous resistance offered to the passage of an electric current by powders and metal filings is greatly reduced under the influence of electric oscillations, which cause the filings to cohere and to become a conductor. In 1890 Branly described a variety of substances which he had found to be sensitive enough to detect Hertzian waves. Lodge employed a device consisting of a glass tube in the ends of which were sealed terminal wires connected to metallic electrodes, between which was placed a small quantity of iron filings. Upon subjecting this tube to an electric

current he caused the deflection of a galvanometer. Inasmuch, however, as the filings, when once they have been made to cohere, continue to cohere until their contact is mechanically destroyed, it was necessary, in order to detect a succession of waves, that some mechanical appliance should be provided whereby the contact should be destroyed and the tube rendered nonconductive as soon as the galvanometer was moved.

While these disclosures of the properties of waves generated in the ether after Hertzian methods excited general interest among scientists, no suggestion had been made of any practical application. In 1892 Sir William Crookes, an eminent English scientist, published an article in the Fortnightly Review on "Some Possibilities of Electricity," which drew attention for the first time to the practical aspect of Hertz's discovery. This remarkable forecast is one of the landmarks in the history of radio-telegraphy. Among other things, he said:

"Whether vibrations of the ether, longer than those which affect us as light, may not be constantly at work around us, we have, until lately, never seriously inquired. But the researches of Lodge in England and of Hertz in Germany give us an almost infinite range of ethereal vibrations or electrical rays, from wave lengths of thousands of miles down to a few feet. Here is unfolded to us a new and astonishing world—one which it is hard to conceive should contain no possibilities of transmitting and receiving intelligence. Rays of light will not pierce through a wall, nor, as we know only too well, through a London fog. But the electrical vibrations of a yard or more in wave length of which I have spoken will easily pierce such mediums, which to them will be transparent. Here, then, is revealed the bewildering possibility of telegraphy without wires, posts, cables, or any of our present costly appliances. Granted a few reasonable postulates, the whole thing comes well within the realms of possible fulfillment. At the present time experimentalists are able to generate electrical waves of any desired wave length from a few feet upwards, and to keep up a succession of such waves radiating into space in all directions. It is possible, too, with some of these rays, if not with all, to defract them through suitably shaped bodies acting as lenses, and so direct a sheaf of rays in any given direction. Enormous lens-shaped masses of pitch and similar bodies have been used for this purpose. Also an experimentalist at a distance can receive some, if not all, of these rays on a properly constituted instrument, and by concerted signals messages in the Morse code can thus pass from one operator to another. What, therefore, remains to be discovered is—firstly, simpler and more certain means of generating electrical rays of any desired wave length, from the shortest, say of a few feet in length, which will easily pass through buildings and fogs, to those long waves, whose lengths are measured by tens, hundreds, and thousands of miles; secondly, more delicate receivers, which will respond to wave lengths between certain defined limits and be silent to all others; thirdly, means of darting the sheaf of rays in any desired direction, whether by lenses or reflectors, by the help of which the sensitiveness of the receiver (apparently the most difficult of the problems to be solved) would not need to be so delicate as when the rays to be picked up are simply radiating into space in all directions, and fading away according to the law of inverse squares.

"Any two friends living within the radius of sensibility of their receiving instruments, having first decided on their special wave length and attuned their respective instruments to mutual receptivity, could thus communicate as long and as often as they pleased by timing the impulses to produce long and short intervals on the ordinary Morse code. At first sight an objection to this plan would be its want of secrecy. Assuming that the correspondents were a mile apart, the transmitter would send out the waves in all directions, filling a sphere a mile in radius, and it would therefore be possible for any one living within a mile of the sender to receive the communication.

This could be got over in two ways. If the exact position of both sending and receiving instruments were accurately known, the rays could be concentrated with more or less exactness on the receiver. If, however, the sender and receiver were moving about, so that the lens device could not be adopted, the correspondents must attune their instruments to a definite wave length, say, for example, 50 yards. I assume here that the progress of discovery would give instruments capable of adjustment by turning a screw or altering the length of a wave, so as to become receptive of wave lengths of any preconcerted length. * * * This is no mere dream of a visionary philosopher. All the requisites needed to bring it within the grasp of daily life are well within the possibilities of a discovery, and are so reasonable and so clearly in the path of researches which are now being actively prosecuted in every capital of Europe that we may any day expect to hear that they have emerged from the realms of speculation into those of sober fact."

In the following year, 1893, Nicola Tesla delivered a lecture before the Franklin Institute in Philadelphia on the subject of high frequency and high potential currents. Tesla was not dealing with Hertz waves, but, after discussing and describing certain apparatus for high frequency illumination and power transmission, he said:

"In connection with the resonance effects and the problem of transmission of energy of a single conductor which was previously considered, I would say a few words on a subject which constantly fills my thoughts and which concerns the welfare of all. I mean the transmission of intelligible signals, or perhaps even power, to any distance without the use of wires. I am becoming daily more convinced of the practicability of the scheme; and though I know full well that the great majority of scientific men will not believe that such results can be practically and immediately realized, yet I think that all consider the development in recent years by a number of workers to have been such as to encourage thought and experiment in this direction. My conviction has grown so strong that I no longer look upon this plan of energy or intelligence transmission as a mere theoretical possibility, but as a serious problem in electrical engineering, which must be carried out some day. The idea of transmitting intelligence without wires is the natural outcome of the most recent results of electrical investigations. Some enthusiasts have expressed their belief that telephony to any distance by induction through the air is possible. I cannot stretch my imagination so far, but I do firmly believe that it is practicable to disturb by means of powerful machines the electrostatic condition of the earth, and thus transmit intelligible signals, and perhaps power."

After speculating upon this problem, and the possibility of solving it by means of his theory of electrostatic induction, or "wabbling the earth's charge," as it has been characterized, Tesla concludes as follows:

"I think that beyond doubt it is possible to operate electrical devices in a city through the ground or pipe system by resonance from an electrical oscillator located at a central point. But the practical solution of this problem would be of incomparably smaller benefit to man than the realization of the scheme of transmitting intelligence, or perhaps power, to any distance through the earth or environing medium. If this is at all possible, distance does not mean anything. Proper apparatus must first be produced by means of which the problem can be attacked, and I have devoted much thought to this subject. I am firmly convinced that it can be done, and hope that we shall live to see it done."

In 1894, Sir Oliver Lodge delivered a lecture before the Royal Institution of Great Britain (which was published in the London Electrician and in book form) on "The Work of Hertz," in which he repeated Hertz's experiments and described various forms of detectors or re-

ceivers which would render manifest the existence of Hertzian waves. Some of these detectors were discoveries of his own; others were repetitions of Branly's discoveries in 1891. Lodge also showed, experimentally and diagrammatically, the forms of Hertzian waves. This lecture, although of great scientific interest, contained no suggestion of practical application to wireless telegraphy. Writing several years later, in his book on "Signaling without Wires," he said:

"Although the method of signaling to a moderate distance through walls or other nonconducting obstructions by means of Hertz waves * * * was practiced by the author and by several other persons in this country, it was not applied by them to actual telegraphy. The idea of replacing a galvanometer * * * by a relay working an ordinary sounder or Morse was an obvious one; but, so far as the present author was concerned, he did not realize that there would be any particular practical advantage in thus with difficulty telegraphing across space, instead of with ease by the highly developed and simple telegraphic and telephonic methods rendered possible by the use of a connecting wire. In this nonperception of the practical uses of wireless telegraphy he undoubtedly erred."

In 1895, a Russian scientist, Prof. A. S. Popoff, in a lecture printed in the Journal of the Russian Physico-Chemical Society repeated some of the experiments of Branly and Lodge, and gave an account of some experiments of his own relative to certain substances which he had noted were detectors of Hertzian waves. In this article Popoff also describes a laboratory experiment in which he noted that if one of his detectors, consisting of a Branly tube containing filings, was connected to a lightning conductor at one end and to ground at the other, in connection with an electric bell and battery, this apparatus would note the existence of a distant thunderstorm in the Ural Mountains. Popoff concludes his paper with the following:

"In conclusion, I may express the hope that my apparatus, with further improvements of the same, may be adapted to the transmission of signals at a distance, by the aid of quick electric vibrations, as soon as the source of such vibrations, possessing sufficient energy, will be found."

To sum up the results of this period of speculation and experiment: The conductive and inductive types of wireless telegraphy had been tried and found impracticable for long-distance signaling. Maxwell, in 1863, had speculated on the possibility of the production of electric waves which would detach themselves from a source of origin; Hertz, in 1887–88, had proved experimentally that Maxwell's theories were correct; Lodge, in 1889, had repeated Hertz's experiments; Branly, in 1890, had repeated Hertz's experiments, and had also discovered that certain substances, in addition to Hertz's ring resonator, were detectors of electric waves; Crookes, in 1892, had forecast the possibilities of wireless telegraphy by the utilization of Hertzian waves; in 1893 Tesla reverted to the impracticable scheme of electrostatic induction; Lodge, in 1894, had reviewed the experiments of Hertz and Branly and some of his own, touching the form which electric waves took when emanating from their source of origin, and upon substances which would detect these waves; Popoff, in 1895, in similar experiments had noted that he could detect the existence of a distant thunderstorm, and had expressed the hope that wireless telegraphy could be

accomplished by the utilization of Hertzian waves. But no one had described and demonstrated a system of wireless telegraph apparatus adapted for the transmission and reception of definite intelligible signals by such means. This was the state of scientific knowledge and practice when in 1896 Marconi applied for his first patent. The foregoing chronological narrative comprises all the prior publications and patents relied upon by the defendant.

## Marconi Patent, Reissued No. 11,913 (1901).

[1] This patent for "improvements in transmitting electrical impulses and signals and in apparatus therefor," was originally issued to Guglielmo Marconi on July 13, 1897, and was reissued under date of June 4, 1901. According to this invention, as described in the specification, electrical signals, actions, or manifestations are transmitted (through the air, earth, or water) by means of oscillations of high frequency, such as have been called Hertz rays or Hertz oscillations. At the transmitting station is employed a Ruhmkorff coil or other source of high tension electricity, having in its primary circuit a Morse key or other signaling instrument, and at its poles appliances for producing the desired oscillations. At the receiving station there is a local battery circuit containing any ordinary receiving instrument and an appliance for closing the circuit, which is actuated by the oscillations from the transmitting station.

The transmitting and receiving means are then fully described and illustrated. At the transmitting station there is a battery and an ordinary Morse key in circuit with the primary of a Ruhmkorff coil. The terminals of the secondary circuit of the coil are connected to two metallic balls fixed at the ends of tubes of insulating material, such as ebonite or vulcanite. Similar balls are fixed in the other ends of the tubes. These tubes fit tightly in a similar tube, having covers, through which pass rods connecting the balls to the conductors. One (or both) of the rods is connected to the ball by a ball and socket joint, which permits the adjustment of the balls in accordance with the quantity and electromotive force of the electricity employed. Directions are then given with respect to the adjustment of the spark gap; and for insuring the regularity and power of the discharge of an ordinary Ruhmkorff coil with a trembler break on its primary, by causing one of the contacts of the vibrating break to revolve rapidly by connecting it to a small electric motor.

At the receiving station is a battery, whose circuit includes an ordinary telegraphic instrument (or a relay or other apparatus) and a circuit closer. The appliance employed as a circuit closer is a glass tube containing metallic powders or grains of metal, each end of the column of powder being connected to a metallic plate of suitable length to cause the system to resonate electrically in unison with the electric oscillations transmitted. Two short pieces of thick silver wire fitting tightly inside the tube are joined to pieces of platinum wire. The tube is closed and sealed to the platinum wire at both ends. Directions are then given with respect to the size of the tube, the preparation and mixture of the powder or filings, and the sealing and operation of the tube.

It is stated that the tube may be replaced by other forms of imperfect electrical contacts, and that, instead of the tuned plates, tubes or even wires may be employed.

It is pointed out that when no oscillations are sent from the transmitting station the tube does not conduct the current and the local battery circuit is broken, but when the powder or tube is influenced by the electrical oscillations from the transmitter it conducts and closes the circuit. When once started, however, the powder in the tube continues to conduct, even when the oscillations have ceased; but if it be shaken or tapped the circuit is broken. A tube well prepared will instantly interrupt the current passing through it at the slightest tap, provided it is inserted in a circuit in which there is little self-induction and small electromotive force; the two plates communicating with the local circuit through two very small choke coils, thereby preventing the high-frequency oscillation induced across the plates by the transmitter from dissipating itself by running along the local battery wires, which might weaken its effect on the sensitive tube. The local circuit in which the sensitive tube is inserted contains a sensitive relay. The tapping is done automatically by the current started by the tube, employing a trembler on the circuit of the relay similar in construction to that of an electric bell, but having a shorter arm. In series or derivation from the circuit actuated by the relay is inserted the telegraphic or other apparatus desired to be worked.

The operation of the apparatus is thus described:

"The Ruhmkorff coil or other source of high tension electrically capable of producing Hertz oscillations being in circuit with a signaling instrument—such as a Morse key, for instance—the operator by closing the circuit in a way commonly employed for producing dots and dashes in ordinary telegraphy will cause the oscillator to produce either a short or a more prolonged electric discharge or spark, or succession of sparks, and this will cause a corresponding short or more prolonged oscillation in the surrounding medium corresponding in duration to the short or longer electrical impulse which in ordinary telegraphy produces a dot or dash. Such oscillations of defined character will thereupon be propagated as such throughout the medium, and will affect a properly constructed instrument at a distant receiving station. At such station the imperfect contact instrument is in circuit with a relay, and when oscillations from the transmitting station reach and act upon such imperfect contact its resistance is reduced, and the circuit is thereby closed during the continuance of the oscillation and for a length of time corresponding thereto. The closing of the relay circuit causes the sounder or other signal apparatus to act in accordance with the particular oscillation received, and the oscillation also immediately starts the action of the shaking or tapping device, which so shakes the powder in the imperfect contact instrument as to cause it to break circuit as soon as the oscillation ceases, which has closed the circuit and produced a movement of the signaling instrument corresponding thereto. I am, therefore, enabled to communicate signals telegraphically without wires by thus artificially forming oscillations at the transmitting station into definite signals by means of a signaling instrument and receiving and reading the same at a receiving station by an imperfect contact instrument, which when acted upon by such defined oscillations operates, first, to close the circuit in accordance with the received oscillation, and produce a corresponding movement of the receiving instrument, relay, or sounder, and also to operate a shaking device to automatically reopen the circuit immediately after the reception of each oscillation, thereby preserving the results of its defined character in the action of the receiver."

Three forms of the system are illustrated and described. When transmitting through the air, and it is desired that the signal should be sent in one direction only, the oscillation producer at the transmitting station is placed in the focus or focal line of a reflector directed to a receiving station, and in the circuit closer at the receiving station is placed a similar reflector directed toward the transmitting station. In this form, illustrated in Figs. 1 to 8, there are neither elevated conductors nor ground or water connections at either station. A second form, illustrated in Fig. 9, is stated to be convenient when transmitting across long distances. Here the plates or conductors are suspended by poles, but there are no ground connections. When transmitting signals by the aid of earth connections, one end of the oscillation producer and one end of the circuit closer are connected to earth, and the other ends to plates preferably electrically tuned with each other in the air and insulated from earth. In Figs. 10 and 11 is illustrated this third form having elevated conductors and ground connections at both stations. It is thus described:

"When transmitting with connections to the earth or water, I use a transmitter as shown in Fig. 10. I connect one of the spheres $d$ to earth $E$, preferably by thick wire, and the other to a plate or elevated conductor $u$, carried by a pole $v$ and insulated from earth, or the spheres $d$ may be omitted and one of the spheres $e$ be connected to earth and the other to the plate or conductor $u$. At the receiving station, Fig. 11, I connect one terminal of the sensitive tube $j$ to earth $E$, also by a thick wire, and the other to a plate or elevated conductor $w$, preferably similar to $u$. The plate $w$ may be suspended on a pole $x$ and must be insulated from earth. The larger the plates of the receiver and transmitter and the higher from the earth the plates are carried the greater is the distance at which it is possible to communicate. When using the last-described apparatus, it is not necessary to have the two instruments in view of each other, as it is of no consequence if they are separated by mountains or other obstacles. At the receiver it is possible to pick up the oscillations from the earth or water without having the plate $w$. This may be done by connecting the terminals of the sensitive tube $j$ to two earths preferably at a certain distance from each other and in a line with the direction from which the oscillations are coming. These connections must not be entirely conductive, but must contain a condenser of suitable capacity—say one square yard of surface. Balloons can also be used instead of plates on poles provided they carry up a plate or are themselves made conductive by being covered with tinfoil. As the height to which they may be sent is great, the distance at which a communication is possible becomes greatly multiplied. Kites may also be successfully employed, if made conductive by means of tinfoil."

It is with this system alone that the single claim in issue deals:

"3. The combination, in an apparatus for communicating electrical signals, of a spark producer at the transmitting station, an earth connection to one end of the spark producer, an insulated conductor connected to the other end, an imperfect electrical contact at the receiving station, an earth connection to one end of the contact, an insulated conductor connected to the other end, and a circuit through the contact, substantially as and for the purpose described."

Thus far I have been using the reissued patent No. 11,913, dated June 4, 1901. It may be convenient at this point to consider the defendant's contention that the claim in issue was narrowed by the affirmative act of the patentee in securing a reissue and by subsequent disclaimer dated December 11, 1905. The original patent No. 586,193,

dated July 13, 1897, contained 56 claims. Claim 43 of the original be-- came claim 3 of the reissue. The only difference between them is that in the latter there are added to the former, at the outset, the words, "In an apparatus for communicating electrical signals," and, in con- clusion, the words, "substantially as and for the purpose described." Save with respect to the specific additions hereafter referred to, the specification of the reissue makes no material change in the original. I note, however, two particular changes pointed out by the defendant: Where the original patent, in describing the construction of Figs. 10 and 11, reads, "When transmitting through the earth or water, I use a transmitter as shown in Fig. 10," the corresponding passage in the re- issue reads, "When transmitting with connections to the earth or wa- ter." Again, where the original patent, referring to the sensitive tube, states that "the tube *j* may be replaced by other forms of imperfect elec- trical contact, but this is not desirable," the reissue, in the correspond- ing passage, omits the last clause. No change whatever was made in the figures.

The application for reissue, filed April 1, 1901, was made upon these grounds:

"That deponent * * * believes that the letters patent No. 586,193, re- ferred to in the foregoing petition and specification, and herewith surrender-' ed, are inoperative or invalid, for the reason that the specification thereof is defective, and that such defect consists particularly in the patentee claim- ing as his invention or discovery more than he had a right to claim as new, and particularly in that some of the claims of said letters patent No. 586,- 193 were made to cover, by their terms, apparatus referred to in certain descriptions of apparatus, employed by one Prof. Popoff, contained in a pub- lication entitled 'Journal of Russian Physico-Chemical Society, vol. 28, 1896, Division of Physics, Part I.' * * *

"That at the time of the filing and prosecution of the application for Unit- ed States letters patent No. 586,193, the publication of the experiments of Prof. Popoff was not known to the deponent, nor, as deponent is informed and believes, to those acting for or on behalf of said deponent, and while the deponent believes that the said publications do not describe any prac- tically operative receiving instrument which can be used with definite arti- ficially produced Hertzian oscillations of a character to record intelligible signals, yet, in view of said publications, the language of certain claims of said letters patent No. 586,193 might be construed as too broad. That the said letters patent No. 586,193 did not contain a sufficiently full explanation of the mode of operation of the system of telegraphy invented by deponent. That the original letters patent No. 586,193 contained, as deponent is in- formed and believes, an unnecessary number of claims, some of which differ from others only in very small details, and the inclusion of which was caus- ed by the fact that the art to which the invention relates was substantially a novel one, and it seemed best to the deponent and those acting for or on be- half of deponent, to present detailed claims for a great number of variations in the form of apparatus to be employed in carrying out the inventions or discoveries of deponent."

Accordingly, in the reissue the 56 claims of the original patent were reduced to 24, and there was added at the end of the original specifi- cation, first, the description of the operation of the patentee's apparatus which I have already quoted in full, and, secondly, the following con- cluding passage:

"I am aware that the sensitiveness of various apparatus, including tubes containing filings, to more or' less distant electrical disturbances has been

observed in a general way, and that it has also been proposed to disturb the conductivity of such filings by various instrumentalities for shaking the tubes containing the same. I am also aware that the use of tubes containing metallic powders of several separate kinds has been described or suggested in connection with certain experiments relating to so-called 'coherers'; but. I am not aware that the utility of a mixture of metallic powders has ever previous to my invention been ascertained and utilized for the purpose of obtaining the required degree of sensitiveness in such an instrument.

"I am aware of the publication of Professor Lodge of 1894, at London, England, entitled 'The Work of Hertz' and the description therein of various instruments in connection with manifestations of Hertz oscillations. I am. also aware of the papers by Professor Popoff in the Proceedings of the Physical and Chemical Society of Russia in 1895 or 1896; but in neither of these is there described a complete system or mechanism capable of artificially producing Hertz oscillations and forming the same into and propagating them as definite signals and capable of receiving and reproducing, telegraphically, such definite signals, nor has any system been described, to my knowledge, in which a Hertz oscillator at a transmitting station and an imperfect contact instrument at a receiving station are both arranged with one terminal to earth and the other elevated or insulated, nor am I aware that. prior to my invention any practical form of self recovering imperfect contact instrument has been described.

"I believe that I am the first to discover and use any practical means for effective telegraphic transmission and intelligible reception of signals produced by artificially formed Hertz oscillations."

As I understand the defendant's contention, it is asserted that if the reissue be construed broadly according to its terms it is invalid because it constitutes an enlargement of the original patent; whereas, the reissue expressly narrows the original patent. I do not agree with either contention. So far as the claim in issue is concerned, I do not perceive that the reissue makes any material or appreciable change. The Popoff publication referred to dealt with a receiving apparatus. The receiving apparatus constitutes only one of the elements in the combination now claimed by the complainant. The same conclusion applies to the defendant's argument with respect to the subsequent disclaimer. It appears that after Judge Townsend had decided, in the case of Marconi Wireless Telegraph Co. v. De Forest Wireless Telegraph Co. (C. C.) 138 Fed. 657, that claim 1 of the reissued patent was invalid, a formal disclaimer of that claim was filed. But this disclaimer can have no effect upon the validity or scope of claim 3, since claim 1 related to a receiver alone, not to the combination specified in claim 3.

In 1896 Marconi brought his invention to the notice of the chief engineer of the British post office, Sir Wm. Preece, for whom in September of that year he demonstrated and confirmed, in experiments on Salisbury Plain, the results which he says he had previously attained in Italy. These tests, as appears from Sir Wm. Preece's report to the British Association, were conducted with parabolic mirrors. In a lecture on "Telegraphy without Wires," delivered at Toynbee Hall on December 12, 1896, Preece expressed great faith in the apparatus:

"The curious thing about it was that there was no new principle introduced. The first man who taught us how to generate these waves was Hertz,. the German physicist, and they had been developed by others. But in making practical use of these waves Mr. Marconi had invented devices which were highly novel and very beautiful."

In March, 1897, in further tests on Salisbury Plain, a distance of about 4 miles was attained. In May, by the use of long vertical wires, communication was successfully established across the Bristol Channel, a distance of 9 miles. This test was made in the presence of representatives of the British postal, war and naval departments, and of the Italian and German governments. The German representative, Prof. A. Slaby, published in Berlin, in November of that year, a description of what he had seen, in the course of which he said:

"What I saw was something new. Marconi had made a discovery. He worked with means the full importance of which had not been recognized, and which alone explained the secret of his success. I ought to have said this at the commencement of my subject, as at a later date, especially in the English technical press, the novelty of Marconi's process was denied. The production of Hertz waves, their radiation through space, the sensitiveness of the electric eyes—all are known. Very good; but with these means 50 meters were attained, but no more. In the first instance Marconi has devised for the process an ingenious apparatus, which, with the simplest means of assistance, attains a sure technical effect. He has thus first shown how by connecting the apparatus with the earth on the one side, and by using long extended vertical wires on the other side, a telegraphy was possible. These wires form the main feature of his invention; the term 'wireless telegraphy' is therefore really a misnomer."

Preece himself, describing the same test in a lecture before the Royal Institute, June 4, 1897, says that the mirrors used in the earlier experiment had been laid aside. He notes as curious the fact that hills and apparent obstructions fail to obstruct:

"The wings shown in Fig. 2 may be removed. One pole can be connected with earth and the other extended up to the top of the mast, or fastened to a balloon by means of a wire. The wire and balloon covered with tin foil or kite becomes the wing. In this case one pole of the transmitter must also be connected with earth. The distance to which signals have been sent is remarkable. On Salisbury Plain, Mr. Marconi covered a distance of 4 miles. In the Bristol Channel this has been extended to over 8 miles, and we have by no means reached the limit. It is interesting to read the surmises of others. Half a mile was the wildest dream."

In the middle of July, 1897, Marconi carried on some tests for the Italian government, at Spezia, between warships and ships and shore, obtaining communication over a distance of 10 miles. The system was thereupon adopted by the Italian navy. Returning to England, Marconi carried out further tests for the post office in the autumn of 1897. In December of that year stations were erected in the Isle of Wight and at Bournemouth, on the south coast of England, 14 miles apart, and early in 1898 these stations were in working order. The first commercial use of the system was made in 1898, in reporting the yacht races at Kingston, Ireland, for the Dublin Express. Marconi testified that on that occasion communication was accomplished over a distance of about 25 miles. The system was also used at Lloyd stations in the north of Ireland for communication with outlying islands, and it was also installed upon lightships in the English Channel.

Marconi testified that he succeeded in transmitting intelligible messages over a distance of 30 or 40 miles with the apparatus shown in the patent in suit; that is, with the spark gap and the coherer directly connected between the earth and the antenna. From

1898 he increased the sensitiveness of the coherer by interposing a transformer. With this improvement he succeeded in March, 1899, in establishing communication across the English Channel between Dover and Bologne, a distance of over 30 miles. In that year tests were made on a large scale by the British navy, resulting in the following year in its installation on 32 warships and shore stations. In 1899, also, following its use in reporting the international yacht races off Sandy Hook, Marconi made a test for the United States navy, when communication was carried on over a distance of 36 miles. Other tests over longer distances had established the value of wireless telegraphy for naval and mercantile purposes upon a firm basis prior to Marconi's application in 1900 for his improved system of syntonic wireless telegraphy, which forms the subject-matter of the second suit.

Marconi's relation to his predecessors appears from the foregoing narrative. The fundamental principles upon which radio-telegraphy depend were discovered and demonstrated by Hertz with his simple form of oscillator and resonator. His oscillator was measurably efficient, but his ring resonator was suitable only for laboratory demonstrations. Righi improved the oscillator, and the timely discovery by Branly of the action of electric oscillations upon powders and metal filings disclosed a practical method of detecting ether waves. This filings tube, or coherer, was developed by Lodge, who added means for restoring the receptivity of the tube after the coherence of the filings under the impact of the waves. Employing the Hertz oscillator with the improved Branly coherer, Lodge demonstrated the transmission of waves by the deflection of a galvanometer. Popoff supplanted the galvanometer by a relay and bell; and for meteorological observations he used as a receiver a vertical aerial wire grounded at one end to a water pipe. Signals had been detected at a distance of more than 100 yards. The possibilities of utilizing ether waves in the communication of intelligence had been foreseen. As early as 1892 Crookes had conceived the idea of transmitting messages in the Morse code by such means.

Now, in his first patent Marconi used improved forms of the Hertz-Righi oscillator and the Branly-Lodge-Popoff coherer or detector. Of the three forms of structure described and illustrated, the first is the well-known horizontal type used by Hertz; in the second, the plates or conductors of the transmitting station are suspended on poles; in the third, there are vertically suspended conductors with grounded connections at both transmitting and receiving stations. In actual use, after some early experiments, the third form of structure, with vertical conductors and grounded connections at both stations, soon superceded the others; and the structure reached its final form upon the abandonment of the elevated plates and the adoption of a vertical wire, an alternative mentioned in the specification. And the practical application of the structure is brought about by inserting a Morse key in the sender and the ordinary receiving instrument in a local battery circuit in the receiver.

In his practical application of Hertz's discovery to telegraphic communication, it is apparent from his specification that Marconi himself,

as well as other scientists, at the time he filed his application for a patent, regarded his improvement in the coherer as his substantial contribution to the art. In its immediate application, and for the relatively short distance attained in early tests, such a conclusion was doubtless correct; but in the subsequent progress of the art the coherer has been abandoned. The grounded vertical aerial wire or antenna at the transmitting and receiving stations is, however, a fundamental feature of the later art. The tentative way in which this feature is advanced is characteristic of the state of scientific knowledge at that time. The statement in his original application that this form is used "when transmitting through the earth or water" was changed in the reissue to "transmitting with connections to the earth or water." "When using the last-described apparatus," he says, "it is not necessary to have the two instruments in view of each other, as it is of no consequence if they are separated by mountains or other obstacles." What is meant by the statement that the two instruments need not be in view of each other is inexplicable, for both Hertz and Lodge had demonstrated the transmission of ether waves through solid walls. The capacity of waves generated by this form of apparatus to overcome mountains or other obstacles is, however, a disclosure of the fundamental significance of the grounded conductor. And, although the specification describes and illustrates another form of structure as convenient for transmitting across long distances, I think that the described characteristics of the grounded vertical conductor plainly indicate its utility for long-distance transmission, as does also the statement that:

"The larger the plates of the receiver and transmitter and the higher from the earth the plates are carried, the greater is the distance at which it is possible to communicate." •

The precise action of the grounded vertical aerial or conductor is not yet agreed upon. But waves thus radiated act as if they traveled with their feet upon the earth, a property which has made it possible to overcome the greatest of all obstacles to long-distance telegraphy—the curvature of the earth. Although Henry had used a grounded vertical wire to magnetize a needle, and the use of the earth as a capacity was well known in electricity, Marconi first applied the grounded aerial to Hertzian wave telegraphy with new and indispensable results. Popoff had used it in his receiver, but its use in the transmitter is the material consideration.

The defendant's contention, that such use was disclosed in the passage (quoted above) from Lodge's 1889 article on "Electric Radiation and Concentration by Lenses," is untenable. The fact that Lodge made no reference to ground connections in his subsequent lecture on the work of Hertz shows that his earlier statement is nothing more than an incidental reference to an abandoned experiment. It is immaterial whether Marconi did or did not understand its method of operation. He understood and described its function, and he expressly claimed it. And although it appears that in his early experiments on Salisbury Plain he used the old form with parabolic reflectors, the evidence shows beyond question that in all subsequent tests he used the

grounded antennæ. Accordingly, I find that the evidence establishes Marconi's claim that he was—

"the first to discover and use any practical means for effective telegraphic transmission and intelligible reception of signals produced by artificially formed Hertz oscillations."

He did not make a pioneer invention in the sense that he discovered the principles of the art at the same time that he applied them to practical use, as did Morse in wire telegraphy and Bell with the telephone. His patent was a pioneer in point of time; but he did not discover the principles, nor did he invent the primary appliances, upon which the transmission of electromagnetic waves are based. In his original application he claims only a patent for "improvements in transmitting electrical impulses and signals and in apparatus therefor," by means of Hertz oscillations, and I think that his subsequent reissue and disclaimer would preclude any broader claim now. Marconi accomplished his result by combining, in the utilization of known principles, features which had been disclosed by others, which he improved and co-ordinated, with additional features of his own invention which subsequent knowledge has shown to be of fundamental importance. These combined means are embodied in the claim in issue, in the practical application of which, without any subsequent improvement, communication was established over a distance of 30 miles.

In such a situation I understand the relevant legal principle to be this: To attack this claim upon the score of novelty, it must be shown that all the elements of the combination were disclosed in some one prior publication, patent, or use. Even if all the elements of a combination be old, it may still disclose invention if the elements combine to produce a new result. As the Supreme Court said in Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177:

"It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention. It was certainly a new and useful result to make a loom produce 50 yards a day, when it never before had produced more than 40; and we think that the combination of elements by which this was effected, even if those elements were separately known before, was invention sufficient to form the basis of a patent."

It is only when the elements constitute a mere aggregation, a mechanical juxtaposition, as distinguished from a real combination, or vital union, and produce no new result, that a patent can be defeated by showing anticipation of the separate parts in divers publications.

Now the defendant has attacked the validity of this patent in both ways. Its expert, Dr. Kennelly, in his testimony pointed out four exhibits, each of which, he asserted, embodied all the elements of the claim in issue: The Edison patent, No. 465,971 of 1891, for wireless telegraphy by induction; Lodge's publication in the Philosophical Magazine, July, 1889, of his lecture "On Electric Radiation and Its Concentration by Lenses"; Lodge's publication in the Electrician, 1894, on "The Work of Hertz"; and Popoff's publication in the Journal of the Russian Physico-Chemical Society, 1895, of his lecture before that society. On the argument, however, the principal contention

213 F.—53

seemed to be that Tesla's 1893 lecture had disclosed an operative transmitting station, which needed only to be combined with the receiving station disclosed by Popoff to bring about a complete anticipation of the patent in suit.

I am of opinion that neither position has been sustained. All the foregoing references have been reviewed in connection with the history of the subject. Some of them have nothing whatever to do with Hertzian wave radiation. Others record mere abandoned experiments. No one of them contains a description of all the elements of the specified combination, in such full, clear, and exact terms as to enable a person skilled in the art to construct and practice the invention without any information derived from the patent. An account of an experiment, by way of suggestion or speculation as to something that might succeed, will not suffice. Even if the doctrine of aggregation or selection were applicable to this issue, no combination of any apparatus disclosed by Tesla, in his experiments with high frequency and high potential currents, with Popoff's detecting apparatus, would produce the elements prescribed in the claim in suit. The requirement in the claim of a spark producer at the transmitting station fixes the method of operation as radiation and differentiates it from Tesla's proposed scheme of induction telegraphy.

With respect to infringement, it appears that the defendant's transmitting station is inductively connected with an oscillating path from antenna to ground through the intervention of an oscillation transformer. At the receiving station the antenna is permanently connected in a closed circuit to ground. This antenna path is inductively connected to a local oscillation circuit through the medium of a transformer. The local oscillation circuit comprises one coil of the transformer, a condenser, and either an electrolytic or a crystal detector. There is also a pair of telephone receivers in a loop around one of the condensers, and a voltaic battery, which, however, may be dispensed with.

The electrolytic detector is a device having for its lower terminals a small platinum cup containing a dilute acid solution. The upper terminal includes an exceedingly fine wire of silver with a platinum core, mounted so as to be adjustable. This wire is prepared for use as a detector by immersing a small portion at the end in an acid solution and applying a battery current so as to remove the silver from the wire, leaving the almost invisible platinum core projecting. In use this fine point of the wire is lowered into contact with the acid in the cup. In the crystal detector the lower terminal is a cup in which there is fastened a piece of crystal of silicon or ferro-silicon, and the upper terminal is a small metal point carried at the end of an adjustable spring arm, so as to enable it to be placed in contact with any desired spot on the crystal. In use a battery and suitably adjusted potentiometer are employed with it to produce a sensitive detector. In both forms the accumulated energy in the closed circuit actuates a quantitatively responsive telephone indicator directly.

Two of the defendant's contentions of noninfringement require consideration. One relates to the grounded antennæ; the other, to the imperfect electrical contact at the receiving station.

The patent in suit describes, illustrates, and claims a specific arrangement of grounded antennæ; "an earth connection to one end of the spark producer, an insulated conductor connected to the other end;" at the receiving station, "an earth connection to one end of the [imperfect electrical] contact, an insulated conductor connected to the other end." No alternative arrangement is suggested. In the defendant's device the spark gap and detector are not in the antenna at all. They are in closed circuits, which are not grounded, and are not physically connected, but only associated inductively and through oscillation transformers, with the grounded antennæ. With the spark producer and detector in closed circuits, which obviously have no ends, how can it be said that the defendant's apparatus falls within the claim?

When the complainant's expert, Waterman, was asked which one of the ends of the detector in an inductively associated system having an open antenna circuit and a closed oscillating circuit was connected to the ground, he admitted that he would have to say that it was not connected with the ground at all. That the inductive arrangement of circuits was a later development is shown by the fact that Marconi subsequently secured a patent for it, in the specification of which his original patent was differentiated. The complainant's contention is that, although there is no direct physical connection, there is electrical connection, which is the material connection. But the material connection is the connection specified in the claim, and that is specifically a physical connection. A claim may, on occasion, be broadly construed; but it may not be rewritten. Marconi's claim was, not for a grounded connection in general, but for a particular connection, which the defendant does not use.

It seems equally plain to me that the defendant's electrolytic and crystal detectors do not infringe the complainant's imperfect contact device or coherer. The action of these detectors has been the subject of much theorizing, but what actually takes place in them does not seem to be known. We must therefore begin with what Marconi describes and illustrates as an imperfect electrical contact device. This was nothing more than a simple filings tube or coherer, which he improved in sensitiveness and efficiency. It was in every essential principle and method of operation the filings tube of Branly, Lodge, and Popoff. So strong was Marconi's reliance upon his improved coherer that, although he stated in his original patent that "the tube $j$ may be replaced by other forms of imperfect electrical contacts," he added that this was not preferred. In the reissue the latter clause was omitted. By that time the art had developed beyond the coherer, and it was apparent that other forms of detectors were preferred. Since then the coherer has been practically abandoned.

The subsequent disclaimer of claim 1 serves to indicate how narrow was Marconi's invention with respect to the coherer. Yet he claimed it under the broad term "imperfect electrical contact," which is the principle of operation. If he is not to be confined to the particular application of that principle which he describes and illustrates, certainly

he must be strictly confined to the principle of operation under which he claimed it.

But the complainant's argument on infringement is based, not upon the language of the claim, but upon Judge Townsend's characterization of the term (it is also referred to in the specification) as meaning a device which operates in virtue of "a variation of resistance." Marconi v. De Forest Wireless Telegraph Co. (C. C.) 138 Fed. 657. Such a construction sweeps within the claim, according to the complainant's expert, Waterman, every known detector except the physiological ones —the frog's leg and the human eye. Such a contention seems to me to run counter to the grounds upon which Judge Townsend invalidated claim 1 of the original patent:

"In the original patent, as already shown, Marconi limited most of his claims to a combination in a receiver for electrical oscillations of his coherer, consisting of a tube and powder, and means for shaking the powder. But inasmuch as this had been disclosed by prior publications, he applied for the reissue, and now by claim 1 has attempted to cover, as shown above, not merely the coherer of his former claims, or any such coherer in a receiver, or a coherer with means for shaking the powder therein, but every form of imperfect contract device, previously disclosed by others, or which might be thereafter discovered whenever combined with any electrical signal apparatus using Hertz oscillations."

In the form of imperfect electrical contact shown in the patent in suit, there is interposed between the two metallic terminals in the glass tube a mixture of powdered metal filings, the resistance of which, until the passage of an oscillatory current, is greater than that of the terminals. Hence there is imperfect electrical contact between the terminals. Judge Townsend held that the De Forest anti-coherer (which operated upon the same principle, but in the reverse manner)—

"does infringe the claims covering an imperfect electrical contact, because it produces the same result, the transmission of the oscillations by a variation of resistance, and by means which operate in the same way, namely, by changing the amount of resistance in the coherer or detector device." ·

Judge Townsend's statement must be construed with reference to the facts before him. The utmost that can be said is that he allowed Marconi those detectors which act as circuit closers and openers by reason of variation of resistance. I am unable to understand how it can be said with any degree of accuracy that the coherer operates by variation of resistance. It operates only when there is a complete change of resistance; and when once the filings cohere under the action of the oscillatory current they continue to act as a conductor without substantial variation until decohered. Both Branly and Lodge said that the resistance of the coherer was practically infinite. So did Marconi as late as 1902. Lodge, in his article on the work of Hertz, gives six classes of detectors, and classifies the filings tube under the heading "microphonic." As late as 1904, Fleming classified detectors as (1) imperfect contact; (2) magnetic; (3) thermal; and (4) electrolytic and chemical (crystal detectors had not then been discovered).

Any possible variation of resistance taking place in the coherer is a variation through a complete group or train of waves. With respect to the defendant's detectors, it is true that both of them are constructed

in such a way as to produce a variation of resistance. In the electrolytic detector, the nitric acid interposed between the platinum terminals has a normal conductivity less than (and accordingly a greater resistance than) the terminals. When, according to the prevailing theory, the oscillatory current heats the acid, its resistance is decreased, or its conductivity is increased. So, also, in the crystal detector, the ferrosilicon has a higher resistance than the terminals between which it is interposed, which resistance is reduced by the passage of electrical oscillations. In both forms of detector the local contact is very small, so that a relatively large resistance is located at the contact. In a similar sense, and because of the interposition of a substance of less conductivity, it may be said that there is an imperfect electrical contact between the terminals in both forms of detector. But whatever theory is adopted of the action which takes place in the defendant's detectors—whether change of resistance, or electrolytic or thermal action, or what not—it is one as between wave and wave. Whatever variation of resistance there is takes place within the limits of a single wave, and that resistance is the same in each succeeding wave.

From an electrical point of view the defendant's detectors are not imperfect electrical contacts, as the term is used by Marconi, because the electrical condition is permanent from wave to wave of electrically received impulses. Moreover, the defendant's devices are rectifiers, which means that in any complete cycle or complete wave of alternating current the positive half wave passes through the device with less obstruction or greater power than the negative half wave. This rectifying action is a definite property, which is the same from wave to wave. The defendant's detectors do not operate in the same manner as the Marconi coherer. In the defendant's device it is the received energy from the distant station which produces the result. It is immaterial that the defendant sometimes uses a local battery, because the local battery current is not varied, much less interrupted, by the so-called detector. Moreover, while the battery does all the work of indicating in Marconi's system, and the received oscillating current is kept away from the indicator, in the defendant's system it is the received oscillating current which does move the indicator, and the local battery is not essential for any purpose.

Clearly, in the patent in suit it is not the received energy which produces the indication; it is the battery circuit which is released and set in action. Marconi described his coherer as a circuit-closing device, and his patent does not suggest any other way of operating except by a circuit closer and opener. The defendant does not use anything operating on a similar principle. It has a permanently closed circuit, without any variability of contact whatever. The defendant could not possibly use a coherer, and Marconi could not possibly use a rectifier, without entirely altering their principle of operation.

The pendency of the companion suit is of itself proof that to change from an apparatus in which the spark gap and the coherer are in the antenna, to a system in which the spark gap and detector are in separate circuits, coupled by transformers to the antenna, is a radical change carrying defendant's device outside the contemplated system

of the patent in suit. The function of the complainant's coherer is to close a local battery circuit so that it may operate a relay; the function of the defendant's detectors is to accumulate the energy in an already closed circuit, and thereby move a quantitatively responsive indicator directly. This is accomplished by the complainant by the breaking down of a gap by means of the electrical impact of the waves upon the loose filings. The defendant accumulates an oscillating current in a separate closed circuit, rectifies this current from a state of oscillating pulses in opposite directions to a succession of pulses in the same direction, and by the current moves the indicator.

Giving the claim in issue, therefore, the broadest construction to which it can possibly be entitled, it seems clear to me that it is not infringed by the defendant. Accordingly I find that the claim, although valid, is not infringed.

## Lodge Patent No. 609,154 (1898).

[2] The object of the Lodge patent, No. 609,154, dated August 18, 1898, as set forth in the specification, is "to enable an operator, by means of what is now known as 'Hertzian-wave telegraphy,' to transmit messages across space to any one or more of a number of different individuals in various localities, each of whom is provided with a suitably arranged receiver," and to effect other ancillary improvements described and claimed.

"The method of intercommunication consists, according to my invention, in utilizing certain processes and apparatus for the purpose of producing and detecting a sufficiently prolonged series of rapid electric oscillations and in so arranging them that the excitation of a particular frequency of oscillation at the sending station may cause a telegraphic instrument to respond at a distant station by reason of being associated, through a relay or otherwise, with a subsidiary circuit capable of electric oscillations of that same particular frequency or of some multiple or submultiple of that frequency. Another distant station will similarly be made to receive messages by exciting at the sending stations alternations of a different frequency, and so on, and thus individual messages can be transmitted to individual stations without disturbing the receiving appliances at other stations, which are tuned or timed or syntonized to a different frequency."

In carrying out the invention the patentee specifies that he uses—

"a definite radiator consisting of a conductor or pair of conductors $h$ $h'$ of large capacity, arranged either as a Leyden jar or preferably spread out into space, one of them being the earth when desired. For the purpose of combining low resistance with great electrostatic capacity, the preferred forms of charged surfaces or capacity areas are cones or triangles or other such diverging surfaces, with the vertices adjoining and their larger areas spreading out into space; or a single insulated surface may be used in conjunction with the earth, in which case the earth constitutes the other oppositely charged surface. To these capacity areas are joined a pan of polished knobs, forming a spark gap.

"Between either capacity area and its knob I place a syntonizing self-inductance coil—that is, a coil of wire or metallic ribbon $h^4$, preferably insulated with any solid or fluid insulator, as in Fig. 2, or in air, of shape suitable to attain greatest inductance with a given amount of resistance— the object of this coil being to prolong the electric oscillations occurring in the radiator, so as to constitute it a radiator of definite frequency or pitch and obtain a succession of tone waves emitted, and thereby to render syntony in a receiver possible, because exactitude of response depends upon the fact that

the total number of oscillations in a suitably arranged circuit is very great, so that a very feeble impulse is gradually strengthened by cumulative action until it causes a perceptible effect on the well-known principle of sympathetic resonance."

The receiver or resonator consists of a similar pair of capacity areas connected by a similarly shaped conductor or self-inductance coil—

"the whole constituting an absorber arranged so as to have precisely the same natural frequency of electrical vibration as the radiator in use at the corresponding emitting station, so that it can accumulate the received impulses—that is to say, can act cumulatively."

As a coherer circuit, the coherer is usually arranged in simple series with a battery and an indicator or recorder, the terminals of this series of instruments being connected to the capacity areas of the receiver close to its self-inductance coil. The coherer is thus affected by every electrical disturbance occurring in the connecting coil or in its capacity areas, and by the aid of the battery at once enables the signals to be detected. This plan of receiver is shown in Fig. 12.

"In some cases I may, as shown in Fig. 13, surround the syntonizing coil of the resonator with another or secondary coil $u$ (constituting a species of transformer) and make this latter coil part of the coherer circuit, so that it shall be secondarily affected by the alternating currents excited in the conductor of the resonator, and thus the coherer be stimulated by the current in this secondary coil rather than primarily by the currents in the syntonizing coil itself, the idea being thus to leave the resonator freer to vibrate electrically without disturbance from attached wires."

Forms of adjustable coils are shown in Figs. 9 and 10. One is called an adjustable coil; the others, replaceable or interchangeable coils; but both, since they tend to a like end and behave similarly, may be included in the term "variably acting coils."

The claims in issue are:

"1. In a system of Hertzian-wave telegraphy, the combination, with a pair of capacity areas, of a self-inductance coil inserted between them electrically for the purpose of prolonging any electrical oscillations excited in the system and constituting such a system a radiator of definite frequency or pitch.

"2. In a system of Hertzian-wave telegraphy the combination, with a pair of capacity areas, of a self-inductance coil inserted between them electrically for the purpose of prolonging any electrical oscillations excited in the system, thus constituting the system a resonator or absorber of definite frequency or pitch, and a distant radiator of corresponding period capable of acting cumulatively."

"5. In a system of Hertzian-wave telegraphy, the combination, with a pair of capacity areas, of a variably acting self-inductance coil, serving to syntonize such a radiator or resonator to any other such resonator or radiator, whereby signaling may be effected between any two or more correspondingly attuned stations without disturbing other differently attuned stations."

The principle of sympathetic resonance, to which the specification refers, must first be defined. Resonance is an increase or amplification of a periodic motion by an intermittent force of the same frequency. A certain or natural period of vibration is characteristic of all bodies, which, when displaced by the application of external force, tend, by virtue of their elasticity, to return and to execute free vibrations until, by virtue of their inertia, they gradually come to rest. Sonorous bodies, such as strings under tension, and confined portions of air, as in the

organ pipe, are further illustrations suggested by the term. Just as very feeble impulses applied to a pendulum at rest, at intervals exactly corresponding to its natural period of vibration, will cause almost any desired amplitude of swing, so bodies capable of executing vibrations by virtue of their own resiliency may be put into strong vibration by a series of impulses in tune with their own natural period. Thus impulses from a tuning fork will cause, another tuning fork of the same pitch to hum a note in unison.

Resonance effects may likewise be observed in the flow of electricity in a circuit. A circuit possessing inductance and capacity has a certain time period of vibration; that is, it takes a certain length of time for an oscillation to complete itself in the circuit. Such a circuit is said to have a definite wave length. A circuit possessing capacity and inductance tends to oscillate electrically at its own frequency. It becomes the seat of an induced oscillatory current when subjected to the influence of electric waves of that frequency, each wave giving a slight impulse to the oscillations already excited, with the result that the induced electromotive forces will be amplified in intensity, just as the swing of a pendulum is increased by the application of properly tuned though feeble touches. However, not only must the impulses, of whatever kind, be rightly timed, but it is also essential to the utilization of resonance that there should be a long series of such impulses of approximately equal strength or amplitude. Having regard to ether waves, such a train can only result where the oscillations from which they proceed occur in a circuit which gives out its energy slowly, for the amplitude of the waves depends upon the energy expended. The energy must not be wasted either by internal resistance or by lavish radiation. On the other hand, if ether waves are to be detected at any great distance, they must be of substantial amplitude. Hence a circuit which is a good conserver of energy, capable of creating a train of waves of approximately equal amplitude, is a feeble radiator; conversely, a good radiator, giving out its energy in one big wave, followed by rapid damping of the remainder, is obviously a poor conserver of energy, and will not create the necessary train of waves of approximately equal amplitude. A similar difficulty applies to the detector. A good radiating circuit will be a good absorbing circuit, but it will not be a good conserver. In proportion to its susceptibility to ether waves is its unfitness to accumulate the effects of a train of waves, for it tends to give off forthwith the energy it receives.

The specification refers to the principle of sympathetic resonance as being well known. No one had done more to make it well known than Lodge himself. In his book on Modern Views of Electricity, published in 1889, in his Philosophical Magazine article of 1889 (reprinted in his book on Lightning Conductors and Lightning Guards, published in 1892), in his Royal Institute Lecture of 1894 on the work of Hertz, and in his book on Signaling through Space without Wires (which is his 1894 lecture with additional matter concerning later developments), the theory of electrical resonance is fully developed.

In his book on Modern Views of Electricity, published contemporaneously with the researches of Hertz, he considers the rate of oscilla-

tion in a Leyden jar by analogy to the vibration of a loaded spring, like the reeds in a music box. The stiffer the spring and the less the lead, the faster it will vibrate. From this data may be calculated the period of its swing. The electric problem and its solution are precisely the same. That which corresponds to the flexibility of the spring is called static capacity; that which corresponds to the inertia of ordinary matter is called inductance. Increase either of these, and the rate of oscillation is diminished. Increasing the static capacity corresponds to lengthening the spring; increasing the inductance corresponds to loading it. The static capacity is increased simply by using a larger jar or by combining a number of jars. Increase in the self-induction is attained by giving the discharge more space to magnetize or by making it magnetize a given space more strongly. To increase the space we have only to make the discharge take a long circuit instead of a short one; but it is just as effective, and more compact, to intensify the magnetization of a given space by sending the current hundreds of times round it, instead of only once by inserting a coil of wire into the discharge circuit. So much for the conditions determining the rate of oscillation.

Next, with respect to the regulation of the damping out of the vibrations; i. e., the toal duration of the discharge. Resistance is one thing; radiation is another. Just as the vibrations of a reed are damped partly by friction, but partly also by energy transferred to the surrounding medium and consumed in the production of sound, so the oscillatory discharge of a Leyden jar is damped out by the radiation of energy into the surrounding medium. A Leyden jar discharge can so excite a similarly tuned neighboring Leyden jar circuit as to cause the latter to burst its dielectric, if thin and weak enough. The well-tuned impulses accumulate in the neighboring circuit till they break through a quite perceptible thickness of air. Put the circuits out of unison by varying the capacity, or by including a long wire in one of them; then, although the added wire be a coil of several turns, well adapted to assist mutual induction as ordinarily understood, the effect will no longer occur. It can be obtained again by diminishing the static capacity.

In his Philosophical Magazine article he discussed experiments on Leyden jar discharges in which the Leyden jar coatings were represented by large insulated plates connected by a straight rod, after the manner of Hertz. The electrical surgings in the Hertz oscillator are of the same character as in a Leyden jar, discharging round an extensive circuit; but whereas from a closed circuit the intensity of the radiation will vary as the inverse cube of the distance as soon as the circuit subtends a small angle, the radiation from a lineal or axial oscillator varies in its equatorial plane only as the inverse distance, as Hertz showed. Hence for obtaining distant effects the lineal oscillator is vastly superior. Lodge points out that in this connection exact tuning of the receiver is unessential:

"If resonance occurred to any extent, so that the combined influence of a large number of vibrations were really accumulated, the effects might doubtless be great; but hitherto I have seen no evidence of this with linear oscillators, the reason being, I suppose, that the damping out of the vibrations is so vigorous that all oscillations after the first one or two are comparatively

insignificant, and very bad adjustment, or no adjustment at all, will give you the benefit of all the resonance you can get from such rapidly decaying amplitudes. The main reason of the rapid damping is loss of energy by radiation. The power of the radiation while it lasts is enormous, and the stock of energy in a linear oscillator is but small. Leyden jar discharges in closed circuits only die away after many more oscillations, and for them some approach to exact tuning is essential if a neighboring circuit is to respond easily."

In the lecture on the work of Hertz, referring to the vibrations set up in suitable elastic bodies by the radiant energy emitted by a struck bell or tuning fork, he points out that if the body receiving them has its natural or free vibrations violently damped, so that when left to itself it speedily returns to rest, then it can respond fully to notes of almost any pitch. But if the receiving body has a persistent period of vibration, continuing in motion long after it is left to itself, then far more facility of response exists, but great accuracy of tuning is necessary if it is to be fully called out; for if the receiver is not thus accurately syntonized with the source it fails more or less completely to respond. Conversely, if the source is a persistent vibrator, correct tuning is essential, or it will destroy at one moment motion which it originated the previous moment; whereas, if it is a dead-beat or strongly damped exciter almost anything will respond equally well or equally ill to it. He refers to his demonstration (1890) of electrical resonance with a pair of glass Leyden jars by connecting each to a discharge circuit, the one complete, the other with an air gap, and providing the first or receiving jar with an overflow path or by-circuit with an air gap across which a visible spark could occur whenever the induced oscillations accumulated in its main circuit were sufficiently intense to make the jar overflow. But he points out that a closed circuit such as this is a feeble radiator and a feeble absorber, and hence not adapted for action at a distance; nor was this resonance excited by true waves. By separating the coats of the jar as far as possible, however, we get a typical Hertz vibrator, which radiates powerfully. In consequence of its radiation of energy, its vibrations are rapidly damped. Hence it follows that it has a wide range of excitation; that is, it can excite sparks in conductors barely in tune with it.

"The two conditions, conspicuous energy of radiation and persistent vibration electrically produced, are at present," he concludes, "incompatible. Whenever these two conditions coexist, considerable power or activity will, of course, be necessary in the source of energy. At present they only coexist in the sun and other stars, in the electric arc, and in furnaces."

Now Hertz adjusted the inductance and capacity of his detector so as to attune it with his radiator, with the idea of rendering the detector more sensitive by utilizing as far as possible the theory of sympathetic resonance. But his arrangements were in the nature of a compromise. His open oscillatory circuit was an excellent radiator, but not a persistent oscillator. The rapid dissipation of energy in radiation rapidly damped out the oscillations, and the resulting ether waves consisted of one wave of great amplitude followed by a few others of rapidly diminishing amplitude. On the other hand, his closed ring detector was a feeble absorber but a good conserver, by virtue of being at once a poor radiator and a persistent vibrator.

In Marconi's first structure he made use, as I have shown, of an open circuit at both the sending and receiving stations. Hence, in accordance with what has been said about the Hertz oscillator, his transmitter was a good radiator and his receiver a good absorber, though by virtue of these very qualities the former could not create nor the latter accumulate the effect of such a series of waves of equal amplitude as would be necessary for utilizing in any effective way the principle of resonance. Nevertheless, with this principle in mind, Marconi specifies that his elevated capacity areas or plates are "preferably electrically tuned with each other"; that is, of similar electrical dimensions. Hence, while Hertz effected whatever tuning was possible in his structure by adjusting the capacity and inductance in his closed receiving circuit, Marconi adjusted the capacity of his open transmitting and receiving circuits.

Thus stood the theory and practice when Lodge applied for the patent in issue. The theory of electrical resonance was well known, as was also capacity and inductance. The use of self-induction coils was old; the effect of the turns of the coil upon one another was well known. But in Lodge's experiments with his syntonic Leyden jars, in Hertz's adjustment of his ring resonator, and in all the other references relied upon by the defendant, self-induction coils had been used only in closed circuits. Such use contained no instruction upon the effect of a coil in an open radiating circuit. One might as well attempt to study articulation by observing the sign language of deaf mutes. The only attempt that had been made to tune open radiating circuits was by way of adjusting the capacity of the two circuits. But capacity alone will not syntonize. By increasing the length of his aerial wire or antenna Marconi could vary the time period or frequency of the oscillations, and thus vary the wave length; but there was no effective syntony because the oscillations would still die out too rapidly. It is the capacity of the self-induction coil to store up or conserve the energy, so that the waves are sent out in a train of approximately equal amplitude rather than in one great splash, that renders effective tuning possible. It is true that even a straight wire has inductance, and that by increasing its length its inductance is also increased to the same extent; still, such a wire will send off a rapidly damped series of waves, with which no true syntony is possible.

Lodge solved the problem by a compromise between the radiatory and oscillatory qualities of his transmitter, on the one hand, and between the absorbing and accumulating qualities of his receiver, on the other hand. He was the first to realize that if he could get a long train of waves he could afford to diminish the amplitude of the first few of them, the desired result being effected by cumulative effect. The principle disclosed by him was that, although a radiator with several swings is less violent at its first impulse than a momentary emitter, the lessened emitting power of a radiator may be largely compensated by a correspondingly prolonged duration or vibration on the part of the receiver or absorber, thus rendering the radiator susceptible of tuning to a special similarly tuned receiver. The tuned receiver then responds, not to the first impulse of the radiator, but to a succession of

properly tuned impulses, so that after an accumulation of the first few swings the electrostatic charges in the terminal plates become sufficient to overflow and spit off into the coherer, thereby effecting its stimulation and giving the signal. A resonator tuned to some different frequency of vibration would be unable to accumulate impulses and hence would not respond—unless, of course, it were so near the radiator that the very first swing stimulated it sufficiently to disturb the coherer, in which case again tuning is impossible.

The compromise by which effective syntony was thus made possible in wireless telegraphy was effected by the induction coil between the capacity areas of both transmitter and receiver, whereby the natural frequency of the circuits was not only diminished, but their electrical inertia was also increased; and in this way the transmitting circuit was able to create, and the receiving circuit to accumulate, the effect of a series of waves, as distinguished from a single wave of great amplitude.

It seems plain to me, therefore, that the patent in issue is valid, and that the subject-matter was not disclosed by the prior art. Lodge was aiming however, at selectivity alone, and he obtained the syntony which rendered that possible only at the expense of the radiating power of his transmitter. In the chapter on syntonic telegraphy in his book on Signaling without Wires (first published, as the context shows, at least as late as 1899; the copy in evidence is the third edition, published apparently in 1906), he states, in describing the patent in issue: "For the most distant signaling the single pulse or whip crack is the best." And so it was, so long as a single circuit was used. The reconciliation of the incompatability which he compromised was not attained until two circuits were employed at both transmitting and receiving stations, as in the second Marconi patent in issue. Although, therefore, the necessity for compromise was afterwards obviated, and means were found whereby increased distance as well as selectivity could be secured, Lodge's disclosure in the patent in issue is still an essential feature in that result.

That the claims in issue rest upon the defendant's structure admits of no doubt. Both its sending and receiving stations comprise an elevated conductor, acting as one capacity area, and the earth connection as the other, with a variable inductance coil between them for purposes of syntony.

The fact that laches is not set up in the answer as a defense to this patent relieves me of the necessity of considering it.

Marconi Patent No. 763,772 (1904).

[3] The stated object of patent No. 763,772, for apparatus for wireless telegraphy, is:

"To increase the efficiency of the system and to provide new and simple means whereby oscillations or electric waves from a transmitting station may be localized when desired at any one selected receiving station or stations."

The system—

"includes at the transmitting station the combination, with an oscillation transformer of a kind suitable for the transformation of very rapidly alter-

nating currents, of a persistent oscillator, and a good radiator, one coil of said transformer being connected between the aerial wire or plate and the connection thereof to earth, while the other coil of the transformer is connected in circuit with a condenser, a producer of Hertzian oscillations or electric waves shown in the form of a spark producer, and an induction coil (constituting the persistent oscillator) controlled by a signaling instrument."

The system also—

"includes at the receiving station an oscillation transformer, one coil whereof is included between the aerial receiving wire and earth, constituting a good absorber of electrical oscillations, while a device responsive to electric waves, such as an imperfect contact or a device for operating the same, is included in a circuit with the other coil of said transformer."

In description of the drawings the specification says:

"The transmitting station is provided under my present invention with a source $a$ of current electrically connected in circuit with the primary of an induction coil $c$ and with a circuit-closing key $b$ or otherwise controlled by a signaling instrument. In the secondary circuit of said induction coil the spherical terminals or other contacts of a spark producer or other electric wave or oscillation producer are included with a shunt therefrom, in which shunt is included the primary coil $d$ of an oscillation transformer, such as $d^2$. A condenser $e$, preferably one provided with two telescoping metallic tubes separated by a dielectric and arranged to readily vary the capacity by being slid upon each other, is included in one connection from the induction-coil to the transformer winding $d$. The secondary coil $d'$ of the transformer is connected (at one end) to the earth $E$ and at its other end to a vertical wire $A$ or an elevated plate $f$.

"It is obvious that instead of the induction coil and associated parts for producing the electric waves or oscillations I may use any other proper means for producing such waves or oscillations—such, for instance, as a generator of alternating currents.

"The illustrated arrangement of parts at a transmitting station enables much more energy to be imparted to the radiator $f$, the approximately closed circuit of the primary being a good conserver, and the open circuit of the secondary being a good radiator, of wave energy. My experiments have demonstrated that the best results are obtained at the transmitting station when I use a persistent oscillator (an electrical circuit of such a character that if electromotive force is suddenly applied to it and the current then cut off electrical oscillations are set up in the circuit which persist or are maintained for a long time) in the primary circuit, and use a good radiator (i. e., an electrical circuit, which very quickly imparts the energy of electrical oscillations to the surrounding ether in the form of waves) in the secondary circuit.

"In operation the signaling key $b$ is pressed, and this closes the primary of the induction coil. Current then rushes through the transformer circuit and the condenser $e$ is charged and subsequently discharges through the spark gap. If the capacity, the inductance, and the resistance of the circuit are of suitable values, the discharge is oscillatory, with the result that alternating currents of high frequency pass through the primary of the transformer and induce similar oscillations in the secondary, these oscillations being rapidly radiated in the form of electric waves by the elevated conductor.

"For the best results and in order to effect the selection of the station or stations whereat the transmitted oscillations are to be localized, I include in the open secondary circuit of the transformer, and preferably between the radiator $f$ and the secondary coil $d$, an inductance coil $g$, Fig. 1, having numerous coils, and the connection is such that a greater or less number of turns of the coil can be put in use, the proper number being ascertained by experiment."

The patent describes the combination of apparatus at the receiving station thus:

"Referring to Fig. 2, $f$ indicates a plate or cylinder (not essential at either transmitter or receiver) at the upper end of an elevated conductor $A$, which

is connected to the primary coil $j'$ of a transformer or induction coil and thence to earth $E$. In a shunt around said primary $j'$ I usually place a condenser $h$, preferably similar in construction and operation to the condenser $e$. An inductance coil $g'$ of variable inductance is interposed in the primary circuit of the transformer, being preferably located between the cylinder $f'$ and the coil $j'$ and the inductance of said coil may be adjusted in accordance with the method described by me in my letters patent of the United States No. 676,332 to harmonize with the inductance of coil $g$ at the transmitting station, Fig. 1 of the accompanying drawings, or with that of the coil or coils at one or more of the transmitting stations included in the communicating system.

"The secondary coil $j^2$ of the transformer is wound in two parts, preferably as described in my United States letters patent No. 668,315, dated February 19, 1901, and the outer ends of said coil are connected in certain cases through one or more interposed inductance coils $g^2$, preferably of variable inductance, with the terminals of a coherer $T$ or other detector of electrical oscillations. The inner ends of the split secondary coil are connected to the plates of a condenser $j^3$. A condenser $h'$ is sometimes included in a shunt around the detector $T$. $B$ is a battery and $R$ a relay connected to the condenser $j^3$ and controlling a telegraphing instrument or a printing device. $c'$ and $c^2$ are choking coils preventing oscillations from the secondary $j^2$ running into the battery circuit, and thereby confining them to the wave-responsive device."

The complete system comprises four circuits tuned to one another At the transmitting station there is an open oscillating circuit, which is a good radiating circuit, and this is to be tuned to a closed persistently oscillating circuit, constituting a reservoir circuit. At the receiving station there is an open circuit, constituting a good absorbing circuit, and this is to be tuned to a closed circuit, which is a good accumulating circuit. The patent specifies:

"The capacity and self-induction of the four circuits, i. e., the primary and secondary circuits at the transmitting station and the primary and secondary circuits at any one of the receiving stations in a communicating system * * * are each and all to be so independently adjusted as to make the product of the self-induction multiplied by the capacity the same in each case or multiples of each other—that is to say, the electrical time periods of the four circuits are to be the same or octaves of each other."

Referring particularly to the selectivity or inter-station tuning thereby attained, the specification states:

"In employing this invention to localize the transmission of intelligence at one of several receiving stations the time period of the circuits at each of the receiving stations is so arranged as to be different from those of the other stations. If the time periods of the circuits of the transmitting station are varied until they are in resonance with those of one of the receiving stations, that one alone of all the receiving stations will respond, provided that the distance between the transmitting and receiving stations is not too small."

By way of specific and detailed information as to how the capacity and self-induction of these circuits may be independently adjusted, so as to make the product of the self-induction multiplied by the capacity the same in each case, and thus obtain four circuit tuning, a table of tunes is given.

The broad claim of invention resides, therefore, in the independent adjustment of the capacity and self-induction of the four circuits, two at the transmitting station and two at the receiving station, so that the product of these elements in each of the two circuits shall be the same.

in order that the circuits may be in electrical resonance with one another. This broad invention is covered by claims 10 and 20 in issue:

"10. A system of wireless telegraphy, in which the transmitting station and the receiving station each contains an oscillation transformer, one circuit of which is an open circuit and the other a closed circuit, the two circuits at each station being in electrical resonance with each other and in electrical resonance with the circuits at the other station, substantially as described."

"20. In a system of wireless telegraphy, a transmitting station containing an oscillation transformer, the primary of which is connected to a condenser-circuit discharging through a spark gap which automatically causes electric waves of the desired frequency, the secondary of said transformer connected to an open circuit, including a radiating conductor, and with a capacity and a coil for charging the condenser aforesaid; a receiving station containing an oscillation transformer, the primary of which is connected with an oscillation receiving conductor, and with a capacity, a wave-responsive device connected with the secondary of said transformer, and a receiving instrument connected with the wave-responsive device, all in combination with means for bringing the four transformer-circuits, two at each station, into electrical resonance with each other, substantially as described."

Subcombinations of this broad invention, having relation to the transmitting station alone, are covered by claims 1, 3, 6, 8, 11, and 12 in issue. Subcombinations relating to apparatus at the receiving station are covered by claims 2, 13, 14, 16, 17, 18, and 19 in issue.

The essential features of this apparatus and its departure from previous methods of operation are apparent. In his first patent Marconi had disclosed a method and apparatus for the effective transmission of wave energy through the ether of space, and for its utilization in the communication of intelligible signals. But in this early apparatus the energy was quickly radiated and as quickly absorbed. By reason of this characteristic his radiator could not create, nor could his receiver store up the effect of a sustained train of waves necessary for the utilization of the principle of resonance. It was an effective apparatus for distress calls and purposes of that kind, but there was necessarily interference between messages. Moreover, the electric energy that he could get into his transmitter was necessarily limited. The energy supply had to be adapted to the elevated conductor. The capacity of a vertical wire is not great, and the extent to which it may be increased by lengthening the wire or adding capacity areas is obviously limited. Lodge came forward with a new idea. Although he recognized the impossibility of having a circuit which should be at once a good radiator or absorber and a persistent oscillator, he proposed a compromise. He increased the persistence of vibration of his radiating circuit at the expense of its radiating qualities, and increased the accumulative power of his receiving circuit at the expense of its absorbing qualities. Effecting this compromise by means of the introduction of an inductance coil in an open circuit, he obtained a train of waves of approximately equal amplitude and thus rendered effective syntony possible. But the syntony thus obtained was utilized for selectivity alone. It was attained at the expense of the radiating and absorbing qualities of the circuit; and Lodge still supposed that for distant signaling the single pulse or whip crack was best.

Marconi's improvement, in his second patent, upon his own prior apparatus, and his solution of the difficulty involved in Lodge's com-

promise, consists in the substitution for a single circuit in both transmitter and receiver of a pair of circuits, one of which is so constructed as to radiate or absorb readily, and the other to oscillate persistently and be a good conserver of energy. By using two linked circuits in his transmitter, in which the circuit of the primary contains a condenser of any desired capacity, with the usual provision for its discharge through the spark gap, and in the circuit of the secondary the vertical wire, any required energy may be imparted to the radiator, since the closed circuit of the primary is a good conserver or reservoir of energy for the radiating open circuit of the secondary. This arrangement would be futile, however, without means whereby the stored energy of the reservoir circuit could be transmitted to the elevated conductor at the rate at which that conductor could effectively radiate it. The mode of getting the energy from the reservoir circuit into the radiating circuit, in like measure as it is radiated, is the tuning of the persistently oscillating circuit to the radiating circuit. In this way the principle of resonance is fully utilized between the two circuits. Similarly, the two circuits of the receiver are linked through a transformer, so that electrical oscillations in an open and absorbing primary build up similar oscillations in a closed and conserving secondary until the coherer breaks down. Finally, the four circuits must be tuned together.

That this apparatus overcame the difficulties emphasized by Lodge is not disputed. Where Lodge compromised, Marconi reconciled. The open radiating circuit of the transmitter produces a train of waves of approximately equal amplitude without any sacrifice of its radiating qualities, and with increased available energy drawn from the closed and persistently oscillating primary circuit; and the open absorbing circuit of the receiver, unable to accumulate the effect of a long train of waves without a sacrifice of its absorbing qualities, hands over the task to a closed and conserving secondary circuit, which accumulates such effect until the coherer breaks down. With this definite control over radiation, effective selectivity was maintained. So far as possible with a coherer, it enabled full use to be made of the principle of sympathetic resonance. In combination with the increased available energy in the transmitter, the distance over which messages could be sent was enormously increased. With this apparatus Marconi communicated across the Atlantic in 1901, and the claims in issue constitute the essential features of apparatus which has since made possible communication over a distance of 6,000 miles. It is used in more than 1,000 installations by Marconi, and is admittedly an essential feature of the wireless art as at present known and practiced.

I do not understand the defendant to deny that if the claims in issue are valid as thus construed the defendant infringes. At all events this conclusion appears to me to be inevitable. It is true that the defendant directed some evidence to a contention that the four electrical circuits of the patent in suit are not properly described as being in electrical resonance with each other, as specified in claim 10, because the transmitting circuits as illustrated and described are tightly or closely coupled circuits, while in the defendant's system the transmitting circuits are loosely coupled. In consequence of the tight coupling

of Marconi's transmitting circuits two waves are sent out, and his four circuits are not therefore in electrical resonance with each other; while in the defendant's apparatus the loose coupling emits only one wave and admits of electrical resonance. Very little reference is made to this contention in the argument, and I shall not dwell upon it. The terms "loosely" and "tightly" as applied to coupling are relative terms. Fessenden admits that transformers alone whose coefficient of coupling is less than 50 per cent. are loosely coupled transformers. But to determine the degree of coupling between two circuits coupled through a transformer it is not permissible to take the transformer alone; the coupling of the whole circuit must be calculated. And even if the transformer part of the circuits alone be tightly coupled, yet when such a transformer is connected into a grounded antenna circuit the circuits become loosely coupled circuits. The claim directs, not that the circuits at the receiving station must be mathematically tuned to the frequency emitted from the transmitting station, but that the circuits are to be in electrical resonance with each other. This condition results from the independent adjustment of the four circuits so as to make the time period the same, whatever may be the wave form. As a practical matter, perfect coupling—that is, where the coefficient of the two circuits equals unity—is unattainable. Different frequencies are produced, but one is taken as the effective frequency, and the others are disregarded as ineffective or merely parasitical.

In the consideration of the validity of the patent, it must be admitted at the outset that the patent derives very little support from the proceedings in the Patent Office as disclosed by the file wrapper. A patent issued under such circumstances should be, and, so far as I have been able, has been, subjected to the most careful scrutiny and consideration. But the question of abandonment and revival are clearly issues for the Patent Office, not for the court. Nor do I think that the defendant's contention that the patent was unlawfully broadened by the introduction of new matter subsequent to the filing of the original application is well taken. Without prolonging this opinion by setting out the particular passages, it will suffice to say that a careful comparison of the original application with the patent as issued shows that although many verbal changes were made, mostly by way of amplification, the essential features of the patent in issue were clearly set forth in the original application.

[4] In mere lapse of time from the date of the patent to the filing of suit, the defense of laches is presented in an impressive way. But the defense of laches is not tested by time alone. As the Circuit Court of Appeals for this circuit said in the recent case of A. R. Mosler & Co. v. Lurie, 209 Fed. 364, 126 C. C. A. 290:

"There have been cases where all relief has been refused to patent owners who were negligent about enforcing their rights for a long period of time. Richardson v. Osborne [C. C.] 82 Fed. 95, affirmed by this court 93 Fed. 828 [36 C. C. A. 610]. These cases have been such as presented 'unusual conditions or extraordinary circumstances'; usually with knowledge of infringement the owner of the patent has stood by and, without objection or warning, has allowed the infringer to invest his money in a plant for manufacturing infringing devices."

These cases proceed upon the assumption that the party to whom laches is imputed had ample opportunity to assert his right, and that by reason of his delay the adverse party had good reason to believe that the alleged rights had been abandoned or were worthless. Walker on Patents (4th Ed.) 468.

Now laches is an affirmative defense. The evidence in this case bearing directly upon this issue is meager and vague, and the argument in support of it rests largely upon the assertions of counsel rather than upon proof of facts. The implication of equitable estoppel, upon which the doctrine is based, does not appear. This is not an art in which large profits have been made by anybody. Most of the concerns operating in this country have failed, and it is only in recent years, with the establishment of regular transatlantic communication, that the financial prospect has improved. Various governments experimented with the different systems as an instrument available for national defense, collaborating with the inventors or makers. Such was the course in this country, as shown by the Navy Department's "Instructions for the Use of Wireless Telegraph Apparatus," issued in 1903. These instructions are stated to be—

"based primarily on the needs of the apparatus installed, but are, in the main, applicable to any system of wireless telegraphy employing an induction coil for transmitting and a coherer with relay for receiving."

Only incidentally from two photographic reproductions of Slaby-Arco instruments does the origin of any of the apparatus appear.

Prior to the organization of the defendant company in 1902, Mr. Fessenden carried on experimental work as an employé of the United States Weather Bureau. Within two or three years after its incorporation the defendant is said to have sold some equipment to the government; since then it has sold to the Navy Department, according to Mr. Kintner, "about 75 or 80 ship equipments." Just what this equipment was does not appear; nor am I able to find any support in the record for the assertion made by the defendant's counsel that any of this equipment was supplied in direct competition with the complainant company. In 1909 the defendant secured the contract for the equipment of the government's station at Arlington; but as late as 1910 the defendant's counsel stated to a committee of the United States Senate that it was engaged in scientific investigation and experiment rather than in commercial work. At all events, the proof shows that the defendant dealt in a commercial way with the United States government alone prior to 1912. In that latter year it placed apparatus on some Sound boats, and in that year this suit was brought.

The principal defense is that the patent in suit is invalid, first, because the alleged invention was anticipated in prior publications; second, because the apparatus of the patent did not, in the state of the art in 1900, require invention to produce; third, because, if there is any invention, it is the invention of Fessenden and others, not of Marconi. The defendant's expert, Dr. Kennelly, finds direct anticipation of four-circuit tuning, as described in the patent in suit, by Fessenden alone. He asserts there were instances of two-circuit tuning at the sending station prior to Fessenden's application of 1899 for patent No. 706,-

736, as well as instances of two-circuit tuning at the receiving station, but not for the direct combination of both, although even that had been reached by equivalence. Thus Dr. Kennelly finds anticipation of four-circuit tuning in Fessenden's alleged 1899 apparatus, if associated with a sending station employing a Tesla oscillation transformer, or if the Marconi receiving station connections of the 1899 patent were employed with a Tesla oscillator such as described in the Tesla book, or in the Ducretet pamphlet, or as Fessenden claims to have used it. In the argument defendant's counsel claim that there was a disclosure of four-circuit tuning by equivalence in Lodge's 1898 patent, by Tesla in his 1893 lectures and in his patents of 1900 (particularly No. 649,621), and by Pupin; also by a combination of Thompson's sender and Fessenden's receiver, by Tesla's sender and Tesla's receiver, by Tesla's sender and Marconi's 1899 receiver, or Ducretet's apparatus, or by Lodge's 1899 receiver.

The defendant's contention may be summarized thus: The idea of synchronizing four circuits was common knowledge of the prior art and was patented by Tesla. The idea of the transformer at either sending or receiving stations was common knowledge, was published by Lodge, Tesla, and Fessenden before 1900, and was patented by Tesla. Tuning the two circuits of a transformer was common knowledge, and was practiced by Ducretet, Braun, Lodge, Tesla, and Pupin, and was described and used by Fessenden prior to 1900.

I shall consider these defenses, first, with respect to four-circuit tuning as covered by claims 10 and 20 of the patent in suit, and then with respect to the separate tuning of sending and receiving circuits as specified in the subcombination claims. It seems desirable to discuss at the outset, together and in approximate chronological order, the various publications, patents, and practices of Reginald A. Fessenden. The bearing of this is the claim advanced by the defendant that Fessenden conceived the invention of the patent in suit as early as 1891 or 1892, that he disclosed it to others in 1898 or 1899, that he described it publicly in 1899, that he reduced it to practice at Pittsburgh, Pa., in 1899, and that on December 15, 1899, he filed an application for a patent therefor, which was afterwards granted as patents Nos. 706,735 and 706,736.

Fessenden's claim that he developed in 1891 or 1892 the first system of selective telegraphy by resonant circuits ever constructed may be placed on one side, since it appears that the laboratory experiments here referred to were made with the forced oscillations used in line telegraphy, as to which, he admits, the laws of tuning are entirely different from those of free vibrations, and permit of no deductions from one to the other.

Fessenden says that in 1898 he had compared coherers with other forms of receivers invented by him (particularly the hot-wire barreter), and had found coherers to be inferior, inefficient, and unreliable. But in the Electrical World, in August, 1897, three months after his students, Bradshaw and Bennett, who continued his experiments, had read their graduating thesis on the subject, Fessenden said:

"Putting to one side the utterances of electrical fakirs about 'wobbling the earth charge,' the fact remains that there are at present three practical means by which messages can be transmitted without wires. The first is the electromagnetic induction method first suggested, I believe, by Professor Henry, or at any rate about the time when he was living. The second is the electrostatic induction method, which has been used to some extent in telegraphing to moving railway trains, which method was developed by Mr. Edison. The third is Marconi's system of telegraphy, with an improved form of Lodge's ball transmitter and 'coherer' receiver."

Apparently his experiments had been abandoned before the end of 1899, for he said in his lecture before the American Institute of Electrical Engineers, November 22, 1899:

"Having thus been forced, some years ago, into X-ray work, with much loss of time and very little results to show for it, I considered myself proof against the seductions of liquid air and wireless telegraphy. Consequently, when having suggested to one of the editors of the New York Herald that they report the international yacht race by the new method, I was invited by them in December, 1898, to undertake the work myself, I declined and put them in communication with Signor Marconi."

Fesseden testified that he reduced his arrangement of circuits, for tuning to practice in the fall of 1899 by operating with this type of apparatus a distance of about three miles between Pittsburgh and his laboratory in Allegheny. His testimony is, however, not only indefinite and entirely uncorroborated by documentary evidence, but is also contradicted in important particulars by his own testimony and by that of his assistants, Kintner and Fisher. The oral testimony is contradictory and conflicting both as to the actual date of the experiments and the distance covered. The same may be said of the testimony of what was actually done in this experiment. No messages, it appears from the testimony of Kintner and Fisher, were sent at all, and the only evidence that signals were sent is the statement by Fisher that when he turned on the power Fessenden said he detected a movement of the coil in the receiver. This "successful operation" was a brief experiment during one evening, which was discontinued in consequence of a breakdown of the apparatus.

On January 1, 1900, Fessenden testified, he entered the employ of the United States Weather Bureau for the purpose of adapting the system to the use of the unskilled operators in charge of the Weather Bureau station. At all events his work continued for some time to be admittedly experimental. He fixes the date (May, 1902) when he produced a system which the Bureau considered satisfactory for its purpose. Although he testified on his direct examination that his was a commercial system in January, 1899 (on cross-examination he made it 1896), he declined to answer the question as to what commercial installations, if any, he had made prior to November 1, 1902.

There are many discrepancies with respect to the apparatus alleged to have been used in the autumn of 1899. An examination of the drawing made by Fessenden in 1913 to illustrate the apparatus which he claims to have used in 1899, and a comparison thereof with other drawings made by him relative to the same event, show radical inconsistencies as to what he and his supporting witnesses now claim that the apparatus was. Even assuming that Fessenden in his 1899 experiment

used condensers in shunt with a galvanometer detector, and in shunt with a spark gap, still the defendant has not shown that these condenser circuits were tuned. Much less has the defendant proved that the condenser circuits were tuned to the open circuits at the transmitting station and receiving station respectively, or that the four circuits were in tune or in electrical resonance with one another. Variable elements, inductance and capacity, both contribute their separate values to determine whether two associated electric circuits are in electrical resonance with each other. These values must be known and definite. But there is no proof of the values in the circuits Fessenden is alleged to have used in Pittsburgh in 1899.

The Fessenden defense is deficient, because not a single piece of apparatus claimed to have been used is produced; not a scintilla of corroborating written evidence that such apparatus as Fessenden illustrates in his 1913 sketch was in fact used; no corroborating written evidence as to when, where, how long, or to what extent any such apparatus was used. It is supported only by the oral testimony of witnesses with respect to occurrences which happened a dozen years ago. And this evidence is conflicting and contradictory.

None of the various Fessenden publications discloses anticipation of the patent in suit. They are all confined to receiving circuits. Of the four "Electrical World" articles, it does not appear that those of August 7, 1897, and July 29, 1899, have any bearing whatever. In the article of August 12, 1899, the first of the three figures shows only a condenser in series with the galvanometer and antenna and ground. Nor does the third figure, which shows an antenna circuit and coherer circuit associated together through a transformer, disclose two circuits tuned to each other. Since he states that he does "not believe in the use of a condenser in the secondary," the purport seems to be merely that where you have a coherer detector in a separate circuit you may connect a condenser in series in the antenna or primary circuit. In the September 16th publication the only condensers illustrated are the condensers C, which, in the first two figures, are in the primary circuit, and, in the third figure, in shunt with the galvanometer. There is no suggestion of tuning.                                                \

The next reference is the paper read by Fessenden before the American Institute of Electrical Engineers, on November 22, 1899, on the possibilities of wireless telegraphy. Fessenden's assertion that this lecture disclosed sending apparatus is not warranted by the paper, and is contradicted by his previous statement in this and in a former action. He shows one form with a condenser in shunt, which he says would avoid resistance losses, just as he said later in his patent. But there is no suggestion that such a condenser was used for the purpose of tuning. An examination of his recapitulation of the points which require investigation indicates very clearly that Fessenden did not know at that time what effect was produced by connecting condensers in series or in shunt with the spark gap or with the detector, nor did he know what the effect of varying the capacity of these two circuits would be. Moreover, when, in the discussion which followed Fessenden's paper, Dr. Pupin clearly indicated that one of the great possible

advances to be made in wireless telegraphy was that of tuning, Fessenden did not then say that he had already solved this problem in his experiments in Pittsburgh, nor did he then say that the apparatus which he had just described and illustrated comprised tuned circuits.

Finally, it is claimed that the application filed by Fessenden on December 15, 1899, for his patents Nos. 706,735 and 706,736, discloses not only two circuits tuned together at the transmitting and at the receiving stations, but four-circuit tuning as well. But neither the specification nor the claims contain a word about tuning. The only mention of condensers in the specification is the statement that the condenser indicated in the first figure may be put in series or in shunt with the transmitter or receiver. The only mention of condensers in the claims is in claim 3, where he refers to a condenser in shunt with the coils and essential ring. While, therefore, a condenser in circuit is shown and claimed, its function is neither described nor claimed, nor is it shown to be adjustable. It has already been held by two courts that Fessenden's original application is barren of suggestion concerning tuning, and that the subsequent amendment relating to tuning was an afterthought, constituting a departure from the original application. United Wireless Telegraph Co. v. National Electric Signaling Co., 199 Fed. 153, 117 C. C. A. 275; National Electric Signaling Co. v. Telefunken Wireless Telegraph Co. (D. C.) 209 Fed. 856.

The file wrapper is particularly illuminating upon Fessenden's asserted knowledge and use of tuned circuits. The Patent Office's rejection of all the claims stated that, in view of the fact that the use of condensers in such systems was common, nothing patentable was shown in claim 3. In response to this invitation to disclose any peculiar function of the condensers or their connections, Fessenden, without any reference to the function performed by the condenser in shunt with the spark gap at the transmitting station, stated that the purpose of the condenser at the receiving station was to reduce the current in the receiving wire without reducing the current in the coil or coils 7, so that the resistance drop is eliminated. This statement was held to be insufficient, and further description was required. In response to this second request, Fessenden stated, not that the purpose of this condenser at the receiving station was for tuning, but that it was for the purpose of "obtaining as large a current as possible in the field coil 7, as this increase in current will give greater torque to the ring 8"; and by amendment all reference to the condenser at the transmitting station was canceled. This was in February, 1901. On May 17th of that year Marconi delivered his lecture before the Society of Arts in London fully disclosing four-circuit tuning. The evidence shows that Fessenden had read this lecture at some time prior to June 29, 1901, for in a communication from him, printed in the Electrical World of that date, he expresses a feeling of pleasure "in reading the admirable communication recently made by Mr. Marconi to the Society of Arts." Thereafter, on March 6, 1902, Fessenden canceled the entire specification and claims and substituted a new specification and claims, among other things restoring the condenser and its connections at the transmitting station. Then, under date of June 19, 1902, two and one-half

years after the filing of the original application, more than a year after
Marconi's lecture, and nearly a year after the four-circuit tuned system
had been installed on the Nantucket Lightship, Fessenden again
amended his application by inserting the following passage:

"It is preferred to place a shunt circuit containing a condenser across the
terminals of the induction coil at the sending station for the purpose of
maintaining sustained radiation. This shunt circuit must be tuned to the
receiving conductor; otherwise, the oscillations produced by it will have no
action upon the wave responsive device at the receiving station. This shunt
circuit, by virtue of its capacity, stores up an additional amount of energy,
and when a spark passes across the gap, since the sending conductor can
radiate energy at a given rate, it must continue to radiate for a longer time
in order to dissipate this additional stored up energy."

Thereupon, on July 2, 1902, the patent (No. 706,735) was granted.
It is unnecessary to review the history of Fessenden's divisional ap-
plication for his patent No. 706,736, since it followed the same course.
It was not until June 19, 1902, therefore, that Fessenden stated any-
where that the condenser circuit must be tuned. The bearing of all
this upon Fessenden's extensive claims of prior knowledge and use of
tuning is significant. As Judge Hand has neatly put it:

"How much he or any one knew is not capable of ascertainment, except by
what he said, and neither in his patent nor anywhere else did he say anything
in the least resembling it."

But it is argued by the defendant that the mere showing of a con-
denser in shunt with the galvanometer detector was a sufficient disclo-
sure to one skilled in the art that the purpose of the condenser was
for tuning. I think that the contrary is plainly shown by Fessenden's
own admission on cross-examination when testifying with reference
to Braun's patent, elsewhere discussed. Although Braun showed a
condenser in shunt with a spark gap circuit, Fessenden admitted that
even a person skilled in the art could not, from an examination of
the drawings, understand how they were intended to work or what
Braun was trying to do. I agree that the mere fact that a condenser is
shown in the drawings of a patent, without a description of its func-
tion, is insufficient to constitute an adequate disclosure.

Tesla's patents, No. 645,576 and the divisional patent No. 649,621,
granted in 1900, relate to a later conception, in which he abandoned
the idea of electrostatic induction, and proposed to produce direct con-
duction in the upper strata of the atmosphere. He states in the earlier
patent that the drawings illustrate a general arrangement of apparatus
for carrying out his invention on an industrial scale—"as, for instance,
for lighting distant cities or districts from places where cheap power is
obtainable." In another passage he says:

"While the description here given contemplates chiefly a method and system
of energy transmission to a distance through the natural media for industrial
purposes, the principles which I have herein disclosed and the apparatus
which I have shown will obviously have many other valuable uses—as, for
instance, when it is desired to transmit intelligible messages to great dis-
tances, or to illuminate upper strata of the air, or to produce, designedly, any
useful changes in the condition of the atmosphere, or to manufacture from
the gases of the same products, as nitric acid, fertilizing compounds, or the
like, by the action of such current impulses, for all of which and for many

other valuable purposes they are eminently suitable, and I do not wish to limit myself in this respect."

The method by which this ambitious scheme is to be attained is particularly specified in the last paragraph of the specification of the divisional patent:

"It is to be noted that the phenomenon here involved in the transmission of electrical energy is one of true conduction and is not to be confounded with the phenomena of electrical radiation which have heretofore been observed, and which from the very nature and mode of propagation would render practically impossible the transmission of any appreciable amount of energy to such distances as are of practical importance."

Tesla's method is fully developed in the specification of the parent patent. Crookes had shown that if terminals were sealed into a glass tube, and the air nearly exhausted, a particular state of exhaustion occurred where the air became conducting, and small electromotive forces were adequate to produce a glow within the tube. It had been a matter of speculation whether the higher strata of the atmosphere, corresponding in pressure to the pressure in the tube, were not also conducting, and whether certain phenomena, such as the aurora, were not due to conduction in the strata. These patents set forth Tesla's theory that if the potential and frequency of the current were high enough, strata much nearer the earth could be made available to conduct. His view was that when the high potential was impressed upon the atmosphere by an elevated terminal—one six or seven miles in height was suggested—then a progressive breaking down of the air would occur, so that it would no longer insulate but would conduct.

He proceeds to distinguish this method from that proposed in his 1893 lecture:

"To conduce to a better understanding of this method of transmission of energy, and to distinguish it clearly, both in its theoretical aspect and its practical bearing, from other known modes of transmission, it is useful to state that all previous efforts made by myself and others to transmit electrical energy to a distance without the use of metallic conductors, chiefly with the object of actuating sensitive receivers, have been based, in so far as the atmosphere is concerned, upon those qualities which it possesses by virtue of its being an excellent insulator, and all of these attempts would have been obviously recognized as ineffective, if not entirely futile in the presence of a conducting atmosphere or medium."

Although he says it had long been known or surmised that atmospheric strata 15 or more miles above sea level are or should be in a measure conducting, the utilization of any conducting properties of the air for purposes of transmission of energy had been hitherto out of question in the absence of suitable apparatus and the difficulty of maintaining terminals at such heights. "Through my discoveries before mentioned," he adds, "and the production of adequate means, the necessity of maintaining terminals at such inaccessible altitudes is obviated, and a practical method and system of transmission of energy through the natural media is afforded, essentially different from all those available up to the present time." What he means by the required altitudes easily accessible and at which terminals can be safely maintained, "as by the aid of captive balloons supplied continuously

with gas from reservoirs and held in position securely by steel wires or by any other means," appears later on when he says:

"From my experiments and observations I conclude that with electromotive impulses not greatly exceeding 15,000,000 or 20,000,000 volts, the energy of many thousands of horse power may be transmitted over vast distances, measured by many hundreds and even thousands of miles, with terminals not more than 30,000 to 35,000 feet above the level of the sea, and even this comparatively small elevation will be required chiefly for reasons of economy, and if desired may be considerably reduced."

After describing the construction and adjustment of the coil, he refers to apparatus which he had used. He describes a combination of primary capacity and inductance giving vibration of from 230,000 to 250,000 times per second. This refers to oscillation of current in the coil, corresponding to a wave length in the coil of about 1,200 meters. If an elevated wire 6 or 7 miles high were connected to such a coil, such a wire would have a wave length by itself of from 48,000 to 56,000 meters, or something like 30 to 35 miles. The connection of such a wire to such a transformer would bring about a condition which would be in no sense resonant. The transformer itself might be resonant, but the connection thereto of such a wire would render resonance impossible. Tesla's conception seems to be entirely remote from the subject-matter of the patent in issue.

Sir Oliver Lodge's book of 1889 on Modern Views of Electricity, his article of the same year in the Philosophical Magazine, and his 1894 lecture on the work of Hertz, contain, as already indicated, much discussion of the theory of resonance. His knowledge is presumably applied to practical use in his patent No. 609,154 of 1897. It is asserted that he there points out that the sending and receiving stations should be tuned together for the purpose of accumulating the energy of a long wave train; that the sending station should be arranged with two circuits, so as to allow the radiating antenna to vibrate freely; that the receiving antenna, connected by a transformer to another circuit containing a coherer, should be free to vibrate electrically without disturbance from attached wires. In Fig. 4 he does show, in a way, two circuits in his transmitter; but so far from using one as a reservoir for the other, when once he has charged his radiating circuit, he separates it entirely from its source of supply. In Fig. 13 he shows the open circuit of his receiving antenna linked through a transformer with a closed circuit containing a coherer. But the secondary circuit, as shown, is not tuned to the circuit of the antenna.

In view of these facts, I am unable to see how Lodge can be said to have disclosed four-circuit tuning. Indeed, the defendant attempts to support his contention that such a disclosure was made by arguments which show that it was not; for it is said that Lodge's silence concerning the tuning of the two circuits of his transmitter is immaterial, in view of the fact that Tesla had long before taught that they should be in tune in order to produce the largest amount of oscillation; that the circuits of the receiving station are at least tunable, and if a condenser be placed in the local circuit in Fig. 13 we have Marconi's receiving station. Nor does the defendant's argument with

respect to patentable invention derive any support from this reference. Here was an electrical engineer of the highest ability, who had formulated the principles of electrical resonance, considering means for overcoming the difficulty which he had himself pointed out, and arriving at a compromise by which the radiating and absorbing qualities of his conductors were partially sacrificed. Although he actually introduces two circuits, he does not see that if only he utilized the principle of resonance between them the problem would be solved. If so able an electrician as Lodge failed to grasp the real advantage of having two circuits, it can hardly be said to be obvious.

Turning, now, to the defendant's references with respect to the tuning of two circuits at transmitting and receiving stations. These are, of course, relevant to the validity of the subcombination claims of the patent in issue relating to the tuning of those circuits, but not to claims 10 and 20. In view of the conspicuous advance in wireless telegraphy achieved by Marconi's four-circuit tuning apparatus, it is not permissible in this, any more than in the case of the earlier Marconi patent (and for the same reason), to piece out a defense by way of anticipation by finding one or more elements of the combination disclosed in one prior publication or patent and other elements elsewhere. The references relied upon by the defendant as showing the tuning of two circuits at a sending station are Tesla, Ducretet, and Braun.

Tesla's Franklin Institute lecture of 1893, dealing with various phenomena resulting from the high frequency, high potential currents produced by the Tesla coil, has already been considered in connection with the first Marconi patent. It embodies Tesla's conception of the static induction method, by means of which he proposed to "wabble the earth's electric charge." If it were otherwise relevant to the subject of electromagnetic radiation, it would still appear to me to be wholly insufficient as a disclosure of the specific combination of apparatus of the claims in issue. The Tesla coil was one having a coarse wire and a fine wire winding, and it was subject to a species of adjustment whereby the length of the fine wire winding or the size of the condenser was such as to give maximum potentials at the terminal. It was not pretended that the "resonance" referred to in this connection was true resonance. On this and various other aspects of electricity the lecture is highly interesting and suggestive; but his treatment of resonance is speculative and conjectural, for, as he says, "proper apparatus must first be produced by means of which the problem can be attacked." Dr. Kennelly introduced a composite sketch of what he understood Tesla's suggestions to be, as applied to wireless telegraphy. But Mr. Waterman shows that, if the Tesla coil were used as depicted by Dr. Kennelly, the circuit would be inoperative, because the secondary would be unable to carry the energy imposed upon it and would burn out. If the coil were connected with an antenna and ground, the condition of resonance would be obliterated, and the circuits into which the coil was incorporated would not be tuned circuits. I should conclude that the suggestion of its use in radiating Hertzian waves would mean nothing more than the use and connections which Lodge described in his 1898 patent, where he says:

"I supply the electricity to the radiator from a Ruhmkorff or from a Tesla coil, or from a Wimshurst or other known or suitable high-tension machine."

Tesla's patent No. 454,622, of 1891, showing the use of a transformer in the generation of high frequency, high potential currents for electric lighting contains no suggestion of tuning.

In Ducretet's lecture of 1898 he gives two figures illustrating apparatus, but without showing circuit connections. Even if Dr. Kennelly were correct in his translation of the passage on which he relies, all that Ducretet disclosed was that the antenna at the transmitting station and the antenna at the receiving station should be tuned together, just as Lodge in his 1898 patent provided for tuning his mast wires; that is, the total height of the vertical wires should vary according to the distance covered. No possible translation can torture the passage in question into an assertion that the transmitting open aerial was tuned to a closed oscillating circuit at the transmitting station. In Ducretet's trade catalogue of scientific instruments he describes Oudin coils (he calls them radiators), which he says can be used in Hertzian-wave telegraphy. But he does not illustrate how this Oudin coil or resonator should be connected in a wireless telegraph circuit, and Dr. Kennelly's sketch is not warranted by any disclosure made by Ducretet himself. It is demonstrable, as I understand it, that (as in the case of the Tesla coil) inasmuch as the Oudin resonator has a very fine secondary winding, if the Oudin coil were connected as Dr. Kennelly illustrates it, the coil would burn out. As in the case of the Tesla coil, of which it is a modification, the term "resonance," used with reference to the adjustment of the Oudin coil, is not at all the resonance of two circuits containing inductance and capacity as used in wireless telegraphy.

Of Braun's two British patents of 1899 something was said in the testimony, but little reliance was placed upon them in the argument. Dr. Kennelly admits that nothing is said in either of them about tuning the two circuits of the transmitter together. Fessenden admits that the drawings of the earlier patent are insufficient in themselves to disclose tuning. In the later patent the language of the specification is inconsistent with any intention to tune the two circuits together. Moreover, according to Fessenden, the Braun method is inoperative.

As showing tuned receiving circuits, the defendant cites the work of Marconi, Ducretet, and Pupin.

In his 1899 patent, No. 627,650, Marconi introduces in his receiver a pair of circuits linked through a transformer. The purpose of this transformer, Marconi says, was to increase the potential of the oscillation at the terminals of the detector. While a condenser is shown in the closed circuit, it is not adjustable. It was used for the purpose of preventing the battery circuit from being short-circuited by the winding of the transformer. No adjustable inductance is shown. It is true that the specification states:

"It is desirable that the induction coil should be in tune or syntony with the electrical oscillations transmitted;" and that "the capacity of the condenser on the connection between the imperfect contact and the secondary of the coil should be varied [in order to obtain best effects] if the length of wave is varied."

But Dr. Kennelly's contention that this shows "that the receiving station was to be tuned to the incoming electric waves from the sending station by the adjustment of the condenser $K'$ in the secondary circuit, and also by the adjustment of the number of turns in the primary and secondary coils of the oscillation transformer," is in conflict with his testimony in another case in 1911, when he said that all that could be definitely stated was, not that the receiving system was tuned, but that "increasing the number of turns in the secondary winding tends to increase, other things being equal, the induced electromotive force on open circuit of that secondary winding"—which is what Marconi himself says. And Marconi's explanation is:

"What I meant by saying the induction coil is tuned there was that the period of its primary, the primary period of the coil which was connected to the aerial, should be such as to make the period of that circuit—by circuit I mean a coil in the aerial—such as to be in tune with the other station; but I had not conceived at that time that the two circuits of the transformers, or the two receiving circuits, to be more accurate, should be in tune with each other."

I conclude that Marconi did not in that patent, any more than Lodge in his patent, tune the two circuits together.

With respect to Ducretet's foreign patents of 1899, relating to improvements in what he calls radioconductors, reliance is placed upon two of the figures showing certain circuits. The transformer device shown is referred to as "a simple pole induction coil," but is not further described. The entire description of this circuit is that:

"The reception of the electric waves may further be improved by joining in the circuit of the radio-conductor or the relay $R$, the battery $P$, and the condenser or variable capacities $C O'$, a single pole induction coil $I$ (Figs. 5 and 6), and a second condenser $C O$, connected to the earth $D$."

There is nothing showing the association of these coils in any particular way, much less that they are associated in such a way as to tune the circuit. It is true that the patent says that the condensers $C O'$ and $C O$ are variable, and Dr. Kennelly asserts that they are variable for the purpose of tuning. But the specification particularly points out that the purpose of using these condensers was for "insuring the high efficiency of action of my radio-conductor while diminishing the effects of atmospheric disturbances and earth currents"; in others words, to keep out lightning.

Finally, it is asserted that from 1893 to 1895 Pupin, the distinguished inventor in line wire telegraphy, in various publications, developed every refinement of tuning in the art of telegraphy, culminating in his application in the latter year for his patents Nos. 640,515 and 640,516 (granted in 1900). Referring to the later patent, as showing the tuning of the circuits together, counsel say:

"It will be noted that if in Fig. 2 the plates of the condenser $K$, for example, are widely separated, we will have an open absorbing circuit with a tuning device therein, connected by a transformer to a closed tuned secondary circuit containing an indicating instrument. Was it invention for Marconi to carry over into a closely similar art this receiving combination? Certainly it was not, if we consider that in Pupin's discussion of Fessenden's lecture of November 2, 1899, he himself did instruct how to carry it over into the wireless telegraph art. Thus, at page 650, he shows in Fig. 6 a closed oscilla-

tion circuit at the sending end, connected by a condenser to an open radiating circuit, and at the receiving end an open absorbing circuit connected by a condenser to a closed resonating circuit, which in turn is connected by a transformer to a detector circuit, which he describes particularly as having the purpose of storing up resonance effects."

After reconstructing Pupin's Fig. 6 of the patent, and quoting at length from Pupin's statement in the discussion of Fessenden's American Institute of Electrical Engineers' lecture of November 22, 1899, counsel say:

"Pupin, in his figure we have above copied with symbols now in common use, uses at the sending station a condenser as a transformer. * * * The condenser was well understood to be the equivalent of a coil transformer. But more than this, in the receiver circuit Pupin shows a coil transformer $m$ connecting it to the 'secondary winding' containing the coherer. So that if it be supposed the condenser $l$ in his Fig. 6 is not itself the transformer, then it inevitably follows that the loop $m$ is the transformer, with the condenser $l$ shunted around the primary."

Now what did Pupin say in 1899? He said, at the outset, this:

"It is extremely important that we should know from actual personal experiences what are the difficulties involved in wireless telegraphy. But the subject of this evening is 'the possibilities of wireless telegraphy,' and I do not think that the American Institute should adjourn without saying something relative to these possibilities. Of course, when a man speaks about the possibilities of anything, it is all in the future, and he has poetical license —he can indulge to his heart's content. * * * One of the possibilities is the tuning of receiving apparatus. The chief difficulty to-day is that, if two transmitting stations are working at the same time, the message received at the receiving apparatus is unintelligible, because they interfere with each other. It is, therefore, very desirable that the receiving apparatus should be tuned so that it will respond to one transmitting apparatus only, and to no other. The second important point is that we should extend the distance as much as possible. These are the two important points; and I think the possibilities in those two directions are very great."

Later on, speaking of the transmitting wire with a spark gap, he said:

"The free vibrations of a wire like that are like the free vibrations of a string, the elasticity of which varies from point to point. Now, no man on earth would be able to tell you with any degree of exactness what sort of oscillations you would get there. I don't think you would get a pure harmonic oscillation. There will be an oscillation of all sorts of unrelated frequencies. * * * You have the high resistance, dissipation of energy, and the oscillation is a very damped one; you have only a very few waves sent out after each spark. Now, when you have a train consisting of very few rapidly diminishing waves, they cannot produce much resonance. That is the reason why they have not been able to tune their receiving apparatus in England; that is, I think so. I don't know anything in this line for certain. I know only one fact, and that is that nobody has been able to tune the receiving circuit."

Then, after discussing some further possibilities, Dr. Pupin concluded his remarks thus:

"We must put a great deal of energy into our transmitter in order to increase our distance of transmission. The more energy you put into any radiator, I don't care what it is, the better illumination you get. The more energy you can get into an electrical radiator, the more energy you can get out of it, the longer the distance over which you can transmit a certain

amount of energy. There is not the slightest doubt about that. What we want then is, in the first place, to be able to put a great deal of energy into our radiators; secondly, very rapid succession of sparks; thirdly, radiators and receivers of small damping, and as a result of all these things, an efficient tuning of the receiving to the transmitting apparatus. The solution of these problems will increase the sphere of future possibilities of wireless telegraphy more than anything else that I know of."

Nothing could be clearer than this statement. It is absolutely incompatible with the supposition that Pupin himself, or any one else so far as he knew, had solved this problem. The enumeration in the final paragraph of the particulars of the problem to be solved is a clear summary of the disclosures of the patent in issue.

My conclusion is that the claims in issue are valid, not anticipated, and infringed. Decrees in accordance with the foregoing conclusions may be settled upon notice.

## On Reargument.

[5] Prior to the settlement of the decrees in these suits, the question of laches in connection with the Lodge patent was, on the defendant's petition, reargued. Counsel for the defendant now asserts that he intended to raise that issue. Of course, his intention could be gathered only from what he said and did. The defense of laches was set up in the twentieth paragraph of the answer. Having regard to the language used, and upon comparison with the manner in which the two patents in issue and one which was withdrawn were carefully set forth by number in each of the other joint defenses, it seemed plain to me that the defense related to Marconi patent No. 11,913 alone. The defendant's explanation, that the patent number there given merely fixed a date, serves only to make the allegation ambiguous. Laches is attributed to "said complainant and patentee," not "patentees," as reference to a plurality of patents would require, and as was used in such connection in the preceding and in other paragraphs of the answer. The testimony now relied upon by the defendant in support of laches was equally relevant to the defenses of nonuser and lack of utility.

My attention has been called to one statement only in this record where evidence was expressly offered in support of laches; and in that instance the evidence was excluded (Complainant's Rebuttal Testimony, folios 546–561). In neither of the oral arguments, preceding and following the filing of a formal brief, did the defendant's counsel refer to laches in connection with the Lodge patent. In its elaborate printed brief laches was referred to casually in the last paragraph of a section of the argument relating to abandonment by reason of Lodge's prior publications. In the complainant's printed brief reference was made to laches, but the subject was dismissed with the statement:

"Defendant's answer in the first suit (paragraph 20) alleges laches against the first Marconi patent, but not against the Lodge patent."

In the elaborate oral argument which followed, after a long interval, that statement was not challenged by the defendant's counsel, nor was any reference made by them to the subject.

While, therefore, my conclusion that laches was not pleaded was, I feel, justified by the record, the complainant now waives all objection on this score and submits the issue upon its merits, insisting that the defense has not been affirmatively established by proof. So far as the claim to injunctive relief is concerned, I agree. The defendant refers to only four or five passages in the evidence in support of its contention, and this testimony is either vague or conflicting. The defendant's expert, Dr. Kennelly, made the broad statement:

"In all commercial systems of which I have any knowledge, no matter by whom constructed, some kind of a variable inductance coil for tuning has always been employed in connection with the antenna."

Dr. Kennelly has been a college professor since 1902, and the extent of his knowledge of the commercial art of wireless telegraphy is not stated by him, nor does it otherwise appear. But Dr. Kennelly is directly contradicted by Mr. Fessenden, who stated that:

"In the transatlantic work of the National Electric Signaling Company at Brant Rock, Mass., and at Fortress Monroe and elsewhere, we frequently worked without any coil of wire in the antenna at either or both the sending and receiving end."

In fact, the only definite evidence was supplied by Mr. Marconi himself. On direct examination he stated that he had used an inductance coil in the antennæ of his transmitting and receiving circuits as early as 1898, and had used it to a considerable extent in later apparatus. On cross-examination (see Complainant's Rebuttal Testimony, folios 546–549) he admitted that he had steadily infringed Lodge's patent, and that every station built by him probably had an inductance coil in the antennæ.

Marconi's admission has a direct bearing upon the complainant's claim for profits and damages. While the evidence discloses little or no use by Lodge of his patent, Marconi, by far the most active practitioner in the art, was exploiting his system with every possible form of publicity, and in so doing was openly infringing Lodge's patent. As Judge Lacombe said in A. R. Mosler & Co. v. Lurie, 209 Fed. 364, 370, 126 C. C. A. 290, where an owner has remained thus supine for many years, shutting his eyes to what was going on in the art to which the patent belonged, and thus leading the defendant and others to suppose that he intended to make no claim that his patent dominated a portion of that art, it is inequitable that he should come at this late day and insist on being granted an accounting for damages and profits during his long period of inaction.

Accordingly, so far as the Lodge patent is concerned, the complainant may have a decree for an injunction, but without any accounting for profits or damages.